Margaret Carter *vs.* Commissioner of Correction
& others.[1]

No. 95-P-1582.

Suffolk. December 5, 1996. - July 24, 1997.

Present: Perretta, Kass, & Jacobs, JJ.

*Anti-Discrimination Law,* Employment, Race, Sex, Prima facie case, Burden
of proof. *Employment,* Discrimination, Retaliation. *Limitations, Statute of.
Massachusetts Commission Against Discrimination. Evidence,* Hearsay,
State of mind, Motive. *Practice, Civil,* Instructions to jury.

There was no error in an order of the Massachusetts Commission Against
Discrimination (MCAD) allowing an amendment of a discrimination
complaint filed with the MCAD pursuant to G. L. c. 151B, § 5, to add a
claim for retaliation arising out of the subject matter of the original
complaint, where such an amendment was authorized under 804 Code
Mass. Regs. § 1.03(5). [217-220]
In an action brought in August, 1992, pursuant to G. L. c. 151B, § 9, in which
the first discriminatory act occurred in July, 1989, and the last (retaliation)
occurred in December, 1989, and constituted a continuing violation, the fil-
ing of the complaint in Superior Court was timely. [220-222]
Defendants in a discrimination case were not entitled to judgment notwith-
standing the verdict based on an estoppel theory, where the evidence did
not support a claim that the plaintiff had agreed as a condition of her
returning to work in her usual position to the actions the defendants took;
nor did the evidence support the defendants' claim that they acted in good
faith believing the plaintiff had so agreed. [222-224]
At a civil trial, the judge properly excluded proffered testimony of one witness
that purported to describe the state of mind of another witness who had
already testified but who had not been examined on the issue. [224-225]
In an action brought under G. L. c. 151B, § 9, for discrimination in employ-
ment, error, if any, in the judge's instruction to the jury on the plaintiff's
burden of proof was not demonstrated to have prejudiced the plaintiff.
[225-227]

Civil action commenced in the Superior Court Department on
August 28, 1992.

[1]David MacDonald and Robert Priest, the superintendent and deputy
superintendent of Longwood Treatment Center at the times relevant to the
present action.

The case was heard by *John C. Cratsley*, J.

*Rosemary Ford* for the defendants.

*Geraldine S. Hines* for the plaintiff.

PERRETTA, J. Claiming race and gender discrimination and retaliation for filing a complaint with the Massachusetts Commission Against Discrimination (MCAD), the plaintiff Margaret Carter brought an action in the Superior Court pursuant to G. L. c. 151B, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (1994). The jury found the defendants not liable on the discrimination counts but awarded Carter damages on her retaliation claim under c. 151B.[2] The principal issues raised by the parties' cross appeals are whether Carter's retaliation complaint was timely filed and whether the trial judge's jury instructions were erroneous under *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437 (1995). We affirm the judgment.

## THE FACTS

Carter, an African-American, began her employment with the Department of Correction (department) in 1978, as a corrections officer at MCI-Framingham. She was promoted to the rank of sergeant in 1982, and to the rank of captain in 1987.

While at Framingham, Carter achieved satisfactory performance evaluations. In 1986, she was transferred to the Longwood Treatment Center (Longwood), a minimum security institution for inmates with substance abuse problems. At Longwood, she was under the supervision of Ollie Langlois until his transfer to the Old Colony Correctional Center in 1987. Langlois had a good working relationship with Carter, and he found her to be competent and conscientious. While working under Langlois's supervision, Carter presented no disciplinary problems and received satisfactory performance evaluations.

After Langlois's transfer, Sergio Allendes became the deputy superintendent at Longwood as well as Carter's immediate supervisor. At that time, the defendant Robert Priest was a program director, and he too was supervised by Allendes. Again, while working with Allendes, Carter received satisfactory evaluations. Allendes left Longwood in June, 1989, and the defendant

---

[2]Carter raises no issue concerning the jury's verdict for the defendants on her Title VII claims.

David MacDonald appointed Priest the deputy superintendent. Priest thereby became Carter's supervisor.

About a month after becoming Carter's supervisor, Priest issued three verbal warnings and one written warning to her about inaccuracies in the inmate count. These warnings resulted in a two-day suspension, effective July 10, 1989.[3] This was the first time in Carter's career with the department that she found herself unable to perform her duties to the satisfaction of her supervisor.

When, on July 6, 1989, MacDonald handed Carter written notice of her suspension,[4] they had a discussion during which MacDonald advised Carter that a permanent position as sergeant would be coming up soon and that she should give it consideration. He informed her that she was weak, that she lacked managerial ability, and that those officers for whom she was responsible would make more mistakes which, in turn, would lead to her termination. At MacDonald's suggestion, Carter wrote a letter requesting that she be allowed to resume her former position as sergeant. She also asked MacDonald if, because of pressure and stress, she could take some time off from work. MacDonald granted Carter a short leave, and she was due to return to work on July 17, 1989.

On July 11, 1989, Carter filed a complaint with the MCAD alleging that Priest, a white male, had engaged in "discriminatory treatment against [her] with the support of . . . MacDonald, [a] white male," that Priest had "engaged in a pattern of verbal humiliation, harassment, and undue criticism of [her] performance in order to justify a future termination of [her] employment," that Priest had relied upon minor discrepancies in her "shift reports" to justify her suspension from work for two days, that no other manager had been subjected to this type of treatment, and that she had been "forced to request a transfer to a lower position by [her] supervisor who told [her] that [her] failure to do so would result in [her] termination." She also reported that MacDonald and Priest "have created a very hostile

---

[3]Under the department's "progressive discipline" policy, a verbal warning preceded a written warning followed by a formal written warning and suspension and, finally, termination.

[4]Under the department's rules and regulations, only the superintendent had the authority to impose a suspension.

working environment and numerous persons have witnessed the disparate treatment."[5]

Carter did not return to work on July 17, 1989. Instead, she obtained a stress leave from the department's stress unit and did not return to Longwood until September 5, 1989. While on leave, Priest telephoned her at home on at least three occasions, each time demanding to know when she intended to return to work and threatening her with disciplinary action. He also demanded that she produce documentation of her medical condition even though the department's policy did not require documentation.[6]

By July 25, 1989, Carter had retained counsel.[7] On that date, Carter and her attorney met with MacDonald and an attorney for the department for the purpose of resolving Carter's claims of discrimination. According to Carter, that meeting ended with an agreement to a second meeting. She testified that at the first meeting there was no discussion concerning a change in her job responsibilities. Such a discussion did take place during the second meeting on August 10, 1989. Attorneys were not present at this meeting. Carter testified that at this time, MacDonald raised the possibility of her returning to work with reduced responsibilities, that there were to be daily meetings to review her progress, and that she would assume her former responsibilities as captain one by one. He presented Carter with a handwritten agreement setting out these proposals. However, Carter refused to accept any of the conditions proposed by MacDonald without first speaking with her attorney.

MacDonald testified that the meeting on July 25, 1989, closed with an "agreement to look into [Carter] returning as a captain and putting together a formal training program where she

---

[5]At trial, Carter presented evidence of three incidents of disparate treatment. While Priest was director of security at Longwood, an inmate was mistakenly released prior to his scheduled release date. MacDonald acknowledged that, although this was a serious breach of security, he took no disciplinary action against Priest. Nor did he take any action against two other white males, one of whom was a supervisor, for errors in inmate counts.

[6]There was evidence to show that MacDonald instructed Priest to telephone Carter because he was of the view that her leave was not proper as he had not been notified by the stress unit that Carter had been granted an indefinite leave commencing July 17, 1989. There was also evidence to show that although MacDonald disputed the form of the notice, he in fact had been notified of Carter's leave by a member of the stress unit on July 14, 1989.

[7]Present counsel did not represent Carter until 1991.

wouldn't be overwhelmed and she would assume one duty at a time." It was his position that the handwritten agreement which he presented to Carter at the second meeting and which she refused to sign was merely documentation of what had been agreed to at the earlier meeting with counsel present. In any event, Carter never signed the agreement presented to her by MacDonald.

Thereafter, Carter withdrew her prior request for demotion and returned to work on or about September 5, 1989. Her duties were changed drastically and were no longer consistent with the rank of captain. All her previous responsibilities had been taken from her, and she was now in charge of inmate counts, housekeeping, and urine testing. Additionally, she was required to report daily to Priest. At any time when Priest was absent from Longwood, she was required to "cross-train" or work at another institution. Priest would not allow her to speak at staff meetings, and he conveyed her work assignments to her through her subordinates. Without notice to or consent from Carter, Priest changed her 7 A.M. to 3 P.M. shift to 11 P.M. to 7 A.M. In making that shift change, and contrary to normal practice, Priest had Carter replacing a correction officer rather than a person in a management position.

In another incident, Priest demanded that Carter, contrary to department policy, inform him as to the medical reasons for another employee's medical leave. When Carter refused to do so, explaining that the female employee had confided in her about an extremely personal matter, Priest reported to Mac-Donald that Carter had violated a direct order. MacDonald refused to accept Carter's explanation for her refusal to comply with Priest's order, and he told her to gather her possessions and leave Longwood. There was evidence to show that under department policy, an employee taking medical leave was only required upon his or her return to provide medical documentation of fitness to work. The department did not require an employee to disclose the reason for the needed medical leave.

Carter was able to arrange a transfer to the Old Colony Correctional Center where she once again worked with Langlois. When he became the director of security at Bridgewater Treatment Center, Carter again arranged a transfer to go with him. About a year later Langlois received another promotion and left Bridgewater for MCI-Norfolk. There were no disciplinary incidents involving Carter during the eighteen-month period that she worked with Langlois.

After Langlois's departure from Bridgewater, Henry Lavalley became Carter's supervisor. Thereafter, Carter was disciplined for various missteps which, when also made by male employees, would go unnoticed by her supervisor. On December 31, 1991, Carter left her post forty minutes early, an act for which she was suspended without pay for five days. Carter was ultimately transferred to the Southeastern Correctional Center where she was employed, as a captain, at the time of trial.

### THE DEFENDANTS' APPEAL

1. *Timeliness of the retaliation charges.*[8] An action cannot be brought in the Superior Court under G. L. c. 151B, § 9, unless it is preceded by the filing of a complaint of unlawful discrimination with the MCAD within six months of the occurrence of the discriminatory event. See G. L. c. 151B, § 5. The Superior Court action may be commenced ninety days after the filing of the complaint with the MCAD, or sooner if MCAD permission is obtained, but not later than three years after the alleged unlawful discrimination. See G. L. c. 151B, § 9. See also *Cherella* v. *Phoenix Technologies, Ltd.,* 32 Mass. App. Ct. 919 (1992); *Tardanico* v. *Aetna Life & Cas. Co.,* 41 Mass. App. Ct. 443, 444-445 (1996). The requirement that the § 9 action be preceded by the MCAD complaint "has a dual purpose. First, it is meant to provide the agency with an opportunity to investigate and conciliate the claim of discrimination. Second, the filing requirement provides notice to the defendant of a potential suit." *Conroy* v. *Boston Edison Co.,* 758 F. Supp. 54, 57 (D. Mass. 1991).

Carter filed her discrimination complaint with the MCAD on July 11, 1989. On August 25, 1989, she notified the MCAD that she and the defendants were attempting to resolve their differences and requested a stay of the MCAD action for a period of ninety days. The retaliatory acts against Carter were alleged to have occurred between August 28 and December 31, 1989.

---

[8]The defendants first raised the issue of the timeliness of the charges on a motion to dismiss or, in the alternative, for summary judgment. That motion was denied by a judge other than the trial judge on the basis of existing disputed material facts. The matter was again raised immediately prior to trial, but the trial judge declined to reconsider the prior ruling notwithstanding his authority to do so. The question was ultimately decided on the defendants' motion for judgment notwithstanding the verdict which, as to this issue, the trial judge treated as a motion to dismiss.

However, the MCAD complaint was not amended until October 15, 1991, and the Superior Court action was not brought until August 28, 1992. It has been the defendants' position from the outset of the Superior Court action that Carter's amendment of her complaint with the MCAD and her Superior Court action were time barred under both G. L. c. 151B, §§ 5 and 9. We consider first the amendment to the MCAD complaint.[9]

Preliminarily, it is not clear that an amendment to the MCAD § 5 complaint was a necessary prerequisite to filing a § 9 complaint encompassing retaliation in the Superior Court. There is Federal authority for the proposition that "it [is] unnecessary for a plaintiff to exhaust administrative remedies before she can bring to court a retaliation claim not previously made known to the administrative agency, but arising out of a charge filed earlier with that agency." *Smith* v. *Mitre Corp.*, 949 F. Supp. 943, 948 (D. Mass. 1997). See *Gupta* v. *East Tex. State Univ.*, 654 F.2d 411, 413-414 (5th Cir. 1981); *Brown* v. *Hartshorne Pub. Sch. Dist. No. 1*, 864 F.2d 680, 682 (10th Cir. 1988), and cases therein cited. Although we think these decisions persuasive, we need not determine whether we should follow the Federal reasoning. See *Lynn Teachers Union, Local 1037* v. *Massachusetts Commn. Against Discrimination*, 406 Mass. 515, 521-522 n.7 (1990). Irrespective of whether there was any need to amend the original charge made pursuant to § 5 in order to bring it within the scope of the § 9 Superior Court action, we see no error in the MCAD's order allowing the amendment for the following reasons.

Authorization for amendment of MCAD complaints is found in 804 Code Mass. Regs. § 1.03(5) (1986). As relevant, that section reads:

> "(a) A complaint or any part thereof may be amended . . . to clarify and amplify allegations made therein. An amendment alleging additional acts constituting unlawful discriminatory practices related to or arising out of the subject matter of the original complaint may be permitted by leave of the Commissioner. Amendments shall relate back to the original filing date.

> "(b) Amendments may be made pursuant to 804 CMR

[9]Review of the MCAD order allowing the amendment is open to us under *Christo* v. *Edward G. Boyle Ins. Agency, Inc.*, 402 Mass. 815 (1988).

1.03(5) by the Investigating Commissioner or the Complainant at any time prior to the issuance of a notice of public hearing as provided for in 804 CMR 1.15(4). The complaint may be amended thereafter by the Hearing Commissioner or the Complainant with leave of the Hearing Commissioner. In each instance a copy of the amended complaint shall be served upon the parties."

The amendment in the present case was allowed by the investigating commissioner who also served a copy of the amendment upon the defendants.

There can be no serious claim that the alleged retaliation was not related to or arising out of the subject matter of the original complaint, and the defendants do not advance one. Rather, it is their position that allowance of the amendment was unfair in that it was contrary to the dual purpose of the requirement that a § 9 action be preceded by a § 5 complaint, that is, conciliation and notice. See *Conroy* v. *Boston Edison Co.*, 758 F. Supp. at 57. They argue that although the MCAD was put on notice of settlement efforts by Carter's request of August 28, 1989, for a stay of the agency proceedings, it nonetheless allowed the amendment without first conducting an independent investigation or providing the defendant with an opportunity to be heard.

There is no force in the defendants' claim that the allowance of the amendment frustrated the conciliation purpose of the filing requirement. The original charge of discrimination was still before the investigating commissioner when the amendment was allowed on October 15, 1991. Although action on that charge had been stayed at Carter's request for the purpose of exploring settlement, we think that the investigating commissioner reasonably could conclude, some fourteen months later, that settlement efforts had proved futile. Further, there was a ten-month time lag between the amendment and the filing of the § 9 complaint in the Superior Court. Not only is there nothing in the record to show when or what action, if any, the MCAD took on the charges, as amended, there is also nothing to show that, subsequent to the amendment, the defendants still wished to conciliate their differences with Carter.

Notwithstanding any surprise the defendants may have experienced upon receiving notice of the amendment, they do not point to (and we do not find) anything in the regulations which requires that they be given notice and an opportunity to

be heard on the propriety of any order allowing an amendment to a complaint. Nor is such a right implicit in § 5. The notice interest at stake in that provision pertains to notice of the scope of the potential action that can be brought under § 9. That interest could not have been frustrated by allowance of the amendment almost ten months prior to the filing of the Superior Court action.

Turning to Carter's § 9 complaint, which was filed in the Superior Court on August 29, 1992, the defendants argue that the statute requires the complaint to be brought "not later than three years after the alleged unlawful practice occurred." They claim that the statute began to run as of the date of the first discriminatory act in July, 1989, rather than as of the date of the last act in December, 1989. The trial judge, however, concluded that because Carter's claim for retaliation was necessarily and reasonably related to her original claim of discrimination, the acts forming the basis of the retaliation claim, which occurred in December, must be considered as part of the alleged unlawful practice. Put another way, the trial judge construed the words "unlawful practice" in § 9 to comprehend continuing violations.

In respect to Title VII of the Civil Rights Act of 1964, Federal decisions discuss two types of continuing violations, serial and systemic. See *Jenkins* v. *Wal-Mart Stores, Inc.*, 910 F. Supp. 1399, 1413-1417 (N.D. Iowa 1995), and cases and authorities therein collected. The theory of continuing violations of the serial type has been described in the following terms:

> "[T]he theory recognizes that some acts are imbricated, i.e., they involve an interlinked succession of related events or a fully-integrated course of conduct. Although the limitations clock generally starts with the commission of a discriminatory act, a true 'continuing violation' rewinds the clock for each discriminatory episode along the way. See *Velazquez* v. *Chardon*, 736 F.2d 831, 833 (1st Cir. 1984); *Goldman* v. *Sears, Roebuck & Co.*, 607 F.2d 1014, 1018 (1st Cir. 1979), cert. denied, 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 726 (1980). B. Schlei & P. Grossman, Employment Discrimination Law, 235 (2d ed. Supp. 1987). Thus, if the later violations in the series are within the prescriptive period, an employee may pursue them despite the fact that earlier acts, forming part and parcel of the same pattern, have grown stale."

*Mack* v. *Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 183 (1st Cir. 1989). See *Sabree* v. *United Bhd. of Carpenters & Joiners, Local No. 33*, 921 F.2d 396, 399-400 (1st Cir. 1990).

The MCAD's determination, which we accept, that the retaliatory acts alleged by Carter were sufficiently related to justify amendment of her complaint under 804 Code Mass. Regs. § 103(5)(a) (1986), see *Brown* v. *Hartshorne Pub. Sch. Dist. No. 1*, 864 F.2d at 682, establishes the overlap required for a finding of a serial continuing violation. See *Berry* v. *Board of Supervisors of La. State Univ.*, 715 F.2d 971, 981 (5th Cir. 1983).

The defendants also appear to recognize this. They did not argue that the acts were too unrelated to allow amendment of the complaint, and they do not argue that the acts do not constitute a continuing violation. Rather, they rely upon Federal decisions which hold that the theory of a continuing violation applies only to the limitations period for the filing of an agency complaint and does not extend the time in which the civil court action must be commenced. See *Scott* v. *St. Paul Postal Serv.*, 720 F.2d 524, 525 (8th Cir. 1983), cert. denied, 465 U.S. 1083 (1984) ("A claim of continuing discrimination does not in any way affect the complainant's obligation to file an action in district court within thirty [now ninety] days of receipt of the agency's final decision disposing of his complaint").

These Federal decisions do not support the defendant's argument. Under the Federal statute of limitations, 42 U.S.C. § 2000e-16(c) (1994), the event which triggers the running of the limitation period is notice of the agency's decision. See *Brown* v. *General Servs. Admn.*, 425 U.S. 820, 829-832 (1976); *Robbins* v. *Bentsen*, 41 F.3d 1195, 1197-1199 (7th Cir. 1994). The theory of a continuing violation would have no relevance to such an event. Where, however, the triggering event is the occurrence of the alleged unlawful practice, see 42 U.S.C. § 2000e-5(e)(1) (1994) ("within one hundred and eighty days after the alleged unlawful employment practice occurred"), the theory applies. See *Jenkins* v. *Wal-Mart Stores, Inc.*, 910 F. Supp. at 1413-1414 & nn. 4 & 5.

In *Rock* v. *Massachusetts Commn. Against Discrimination*, 384 Mass. 198, 207-208 (1981), the court held that there was "[n]othing in the wording" of G. L. c. 151B, § 5, that conflicted with the continuing violation rule promulgated by the MCAD,

804 Code Mass. Regs. § 1.03(2),[10] or which required that the statutory six-month limitation period be computed as of the date of the earliest unlawful act. See *Lynn Teachers Union, Local 1037* v. *Massachusetts Commn. Against Discrimination*, 406 Mass. at 520. Section 5 provides that "[a]ny complaint filed pursuant to this section must be so filed within six months after the alleged *act* of discrimination" (emphasis supplied). G. L. c. 151B, § 5, as appearing in St. 1983, c. 628, § 4. It would be anomalous to recognize the applicability of the continuing violation rule in respect to § 5, while precluding its application to § 9. To conclude otherwise could prevent private enforcement under § 9 of claims of continuing violations on the basis that they became time barred during the MCAD proceedings.

2. *Judgment notwithstanding the verdict.* It is the defendants' contention that they were entitled to judgment notwithstanding the verdict on the basis of an estoppel. They claim that those actions which Carter alleged to be retaliatory had been mutually agreed upon at the parties' second meeting on August 10, 1989, as a condition of her return to work in the position of captain.

The evidence precludes the contention that as matter of law the parties had reached agreement on August 10, 1989. The agreement itself is not only unsigned, it reflects that Carter refused to sign and that she wished to discuss the matter with her therapist.[11] The matter was never reported settled to the MCAD, and Carter testified at trial that she never entered into any agreement with the defendants. The defendants' reliance upon *Taylor* v. *Gordon Flesch Co.*, 793 F.2d 858 (7th Cir. 1986), is, therefore, misplaced. In that case, an oral settlement agreement between the parties had been reached. The question before the court was whether that agreement was binding upon the par-

---

[10]This rule is applicable to the filing, rather than the amendment, of the complaint and provides, in pertinent part:

"The complaint may be filed by the complainant . . . at any time within six months after the alleged unlawful conduct; provided, however, that the six month requirement shall not be a bar to filing in those instances where facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature. . . ." 804 Code Mass. Regs. § 1.03(2) (1993).

[11]Although the agreement states that Carter wanted to discuss the matter with her therapist, Carter testified that she wanted to confer with her attorney who was not at the meeting.

ties in a Title VII action, notwithstanding a State law requirement that a settlement agreement must be in writing to be binding.

Nor were the defendants entitled to judgment notwithstanding the verdict on the basis that their actions were indisputably the product of their good faith belief that Carter had agreed to them. They argue that Carter had requested to be demoted to sergeant and that the proposals upon which they believed she had agreed were designed to retrain her so that she ultimately would be capable of performing as a captain. Their argument is made, however, on the basis of the evidence taken in the light most favorable to them. But see *Labonte* v. *Hutchins & Wheeler,* 424 Mass. 813, 820-821 (1997), and cases therein cited.

Carter not only testified that she had withdrawn the request for demotion which MacDonald had suggested she make, but the purported agreement itself reflects that her "[l]etter requesting demotion to sgt. has been withdrawn." Further, although the agreement states that Carter had to accept the terms therein proposed, daily meetings and reduced responsibilities, "before reporting to work as Capt.," the agreement and Carter's testimony show that she returned to work without having accepted any of the terms recited in the purported agreement. Although there was also evidence to show that Priest had kept written reports of his daily progress meetings with Carter and that she had signed her name to those reports, Carter testified that her signature was no more than an acknowledgment of what in fact had occurred rather than indication of her assent to what was being done. According to Carter, she continued to question her new responsibilities, her lack of authority, her performance evaluations, and her disparate treatment.

Carter also related how she found it particularly demeaning that, although her responsibilities had been reduced greatly upon her return to work, one of the duties of a captain which she was allowed to retain was supervision of housecleaning. Although the defendants argue there was undisputed evidence to show that this was a supervisory duty involving no physical labor, that it was one of the many responsibilities of a captain, and that Carter's duties were gradually increased, the argument misses the mark. Carter's claim was that her duties should not have been reduced in the first place and that the reduction, alleged to be retaliatory, was particularly demeaning because of the nature of the duty left to her until her supervisors determined that she was capable of doing more.

We conclude that the evidence was sufficient to withstand the defendants' motions for a directed verdict and judgment notwithstanding the verdict. Compare *MacCormack* v. *Boston Edison Co.*, 423 Mass. 652, 663-664 (1996).

3. *Excluded evidence of state of mind.* Sergio Allendes was questioned on direct examination by Carter about two of his written evaluations of her, in which he noted that she was behind schedule in meeting a performance goal involving laboratory reports of various tests performed on the inmates. In particular, he was asked whether Carter's performance in that area could have been affected by the fact that the institution recently had entered into a contract with a new laboratory. He replied that he had no memory of the "specifics" which formed the basis of the evaluation. He also had no memory of the "specifics" of another evaluation in which he wrote that Carter had to develop her written communication skills and her ability to delegate.

On cross-examination by the defendants, Allendes stated that he never saw MacDonald treat Carter or any other employee in a discriminatory or demeaning manner, that he had daily staff meetings during which he could see that Carter and Priest did not get along with each other, that both "were very territorial." He also related that he gave daily assessments of Carter's and Priest's performance to MacDonald.

At no time did the defendants ask Allendes what he told MacDonald about Carter during those daily meetings. However, on cross-examination of MacDonald, the defendants asked him to relate what Allendes was telling him "on a day-to-day basis" about Carter's performance. Carter's objection to the question was sustained. MacDonald was then asked whether he, at some time, had made a judgment that Carter was having problems performing as a captain. MacDonald answered that after two years of experience, Carter should have been more proficient in the performance of her duties. Instead, her mistakes were becoming more repetitious. It was not until MacDonald added that Allendes "was becoming more frustrated with her supervision" that Carter interrupted with an objection. The trial judge sustained the objection on the stated basis that MacDonald could not describe Allendes's feelings about Carter's performance.

The argument on appeal, which was never put to the trial judge, is that the excluded evidence was relevant to a crucial issue, MacDonald's state of mind and motive in taking the ac-

tions that he did against Carter. This claim might be persuasive had the trial judge's rulings been made in respect to Allendes's, account of his daily statements to MacDonald. "The state of mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the *declarant* if it is relevant to a material issue in the case. *Commonwealth* v. *Borodine*, 371 Mass. 1, 7-9 (1976)." (Emphasis supplied.) *Commonwealth* v. *Bond*, 17 Mass. App. Ct. 396, 398 (1984). Irrespective of the truth of any disparaging statements Allendes might have made to MacDonald about Carter's performance, such statements could be deemed relevant to whether MacDonald had a basis other than retaliation for his actions. See, e.g., *Commonwealth* v. *Hunter*, 416 Mass. 831, 837 (1994), and cases therein cited; *Commonwealth* v. *White*, 32 Mass. App. Ct. 949 (1992). However, the defendants chose not to ask the declarant, Allendes, about his statements, apparently preferring to ask MacDonald for his version of those statements to show a legitimate basis for his actions. We do not consider the defendants' assertion that Allendes's inability to remember "specifics" made him an unavailable declarant. Allendes's inability to remember pertained only to the "specific" bases for two of his written evaluations. There is nothing to show that he could not remember, even in a general way, what he told MacDonald about Carter's performance. In these circumstances, there was no abuse of discretion or other error of law in the trial judge's rulings.[12]

## THE PLAINTIFF'S CROSS APPEAL

On appeal, Carter claims error in the jury instruction on her burden of proof.[13] The stated basis for her objection to the instruction was that, although it was consistent with *St. Mary's*

---

[12]The defendants remaining claim, that the trial judge's instructions to the jury on the attorney-client relationship were erroneous, warrants no lengthy discussion. It is enough to state that the jury were correctly instructed on the law applicable to a determination of whether Carter's former counsel bound her to the proposed terms of the settlement agreement. See and compare *Hubbard* v. *Peairs*, 24 Mass. App. Ct. 372, 377-378 (1987).

[13]The trial judge instructed:

"If you reject the defendants' explanations, I remind you that the plaintiff still has the burden of proof to establish that the defendants, and there would be different defendants in different [special] questions, intentionally discriminated against her, that their discrimination, race or

*Honor Center* v. *Hicks*, 509 U.S. 502 (1993), State law entitled her to recover damages if she established a prima facie case and showed that the defendants' articulated reasons for their actions were a pretext, and that she was not required also to prove more, that the pretext was, in fact, a sham covering discrimination. See *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. 130, 138 (1976); *Brunner* v. *Stone & Webster Engr. Corp.*, 413 Mass. 698, 700 (1992). In noting Carter's objection, the trial judge expressed the view that the subsequent *St. Mary's* decision had become State law.

Almost four months after the trial, the Supreme Judicial Court reaffirmed that "Massachusetts is a pretext only jurisdiction." *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. at 443. The defendants do not argue that the instructions are consistent with *Blare*. Rather, their argument is essentially a claim that *Blare* applies only on motions for summary judgment. A similar argument was disposed of in *Handrahan* v. *Red Roof Inns, Inc., ante* 13, 18-19 & n.13 (1997).

It is not enough, however, for Carter simply to show error in the instructions. She must also show prejudice from the error,[14] and we find none. In his instructions, the trial judge told the jury that they were to answer, as to each defendant, whether that defendant "did . . . intentionally discriminate against the plaintiff . . . because of her race and/or sex while she worked at the Longwood Treatment Center" either by disparate treatment (discipline) or by retaliation. For each defendant, the jury answered "no" as to discrimination by disparate treatment and "yes" as to "discrimination by retaliation." The jury were also informed that a yes answer to any one or more of those ques-

sex discrimination was a motivating factor in either disparate treatment by discipline or in retaliation . . . .

"Do you accept and find sufficiently credible and believable the defendants' non-discriminatory explanation, such as the plaintiff has not sustained her burden of proof. Do you find that the explanation is in fact a pretext or sham covering racial or sexual discrimination, and if you so find and reject the defendants' explanation, the plaintiff still has that ultimate burden to persuade you by a preponderance of the evidence that there was intentional discrimination and that it was a motivating factor in either disparate treatment and/or retaliation."

[14]Although Carter characterizes the error as prejudicial, she offers no explanation as to how she was prejudiced.

tions required them to then determine the "amount of fair and reasonable compensation" to be awarded Carter. The jury fixed the amount at $15,000.

Because of the trial judge's instructions on damages, we do not think it reasonably can be said that the award might have been greater had the jury found discrimination by disparate treatment in addition to retaliation. He instructed that there were two components to an award of reasonable compensation, lost wages and emotional distress. As to the latter, he went on: "In that category we consider shock, anxiety, embarrassment, mental anguish resulting from the discrimination, the intentional discrimination by reason of disparate treatment in the area of discipline and/or retaliation . . . . You and you alone determine what the lost wages would be, what the pain and suffering or the emotional distress award would be. You add them together and you'll see that there's a single figure for a damage award. There is no yardstick, jurors, in this area. You use your common sense, your sense of fair play, your background and experience with all of life's events to reach a damage award, guided by the fact that it must be limited to lost wages and/or pain and suffering, emotional distress, resulting from any intentional discrimination in the areas of disparate treatment, that is discipline, and/or retaliation that you find to have occurred."

In instructing the jury on how to arrive at a figure for damages, the trial judge did not suggest that the jurors were to assign a dollar value to each of the various elements of distress to be considered, e.g., shock, anxiety, embarrassment, etc., then add those figures up to arrive at the amount assigned for emotional distress. Rather, he instructed them to consider the over-all distress suffered by Carter, whether it be from disparate treatment or retaliation.[15]

Based upon the instructions on damages and the form of the questions put to the jury for their determination, to which no objections were lodged, we see no prejudice to Carter by reason of any error in the instructions on her burden of proof.

*Judgment affirmed.*

---

[15]Carter offered no evidence to show that the distress she suffered on account of race and gender discrimination was separate from the distress caused by the retaliation.