FISHMAN, KENNETH J., J.
The plaintiff, Mary E. Murray (“Murray”), alleges that the defendant, Fra-mingham County Club (“the Club”), discriminated against her based on her sex in violation of G.L.c. 15 IB and G.L.c. 272, §§92A and 98. The plaintiff contends that the defendant gave preferential treatment to male applicants, enforced golf rules that prevented women from golfing during preferred tee times, and denied her membership to the Club because she challenged its discriminatory practices. The defendant denies that it engages in discriminatory activity and argues that it is not subject to the provision of G.L.c. 272, §§92A and 98 because it is not a place of public accommodation. The defendant moves for summary judgment on all counts. For the reasons detailed herein, the defendant’s motion is ALLOWED in part, and DENIED in part.
BACKGROUND
The facts viewed in the light most favorable to the non-moving party, as revealed by the summary judgment record, are as follows.[1]
The defendant, Framingham Country Club (“the Club”), is a private, non-profit social and golfing club. It is governed by the Club’s by-laws. The Club limits its membership to 300. In order to become a member, an applicant must fill out an application signed by two existing members.[2] In addition, a current member of the Club must write a letter of endorsement, and the applicant must provide information to verify his or her ability to meet the financial commitments to the Club.[3] The applicant is then interviewed by the Chairman of the Admissions Committee and must receive the approval of seven of the nine Board Members. The applicant is thereafter placed on a waiting list, posted in the clubhouse where existing members are notified of the applicant’s status and may make objections. Once an applicant’s name reaches the top of the waiting list, his or her membership is again voted on by the Board and must be approved by seven of the nine Board members. There have been at most two applicants rejected over the past ten years.
Although the Club’s property is privately owned, it opens its facilities to some public use. The Club’s website invites the public to apply for memberships and announces Club tournaments that are open to the public. The Club also allows non-member local groups use of the facilities.
These groups include the high school golf team, legal services groups, law firms, and the Framingham Recreation Department. Members of the Club are allowed to invite guests to the Club for golf and social functions. Members can also sponsor non-member functions at the Club’s facilities. About twenty-two non-member functions and golf tournaments are held at the Club each year. The income from these events is less than one percent of the Club’s annual income. The Club also has a golf shop on properly run by a golf professional as an independent contractor. The golf shop sells to the public and the income from these sales represents less than one percent of the Club’s annual income. The minutes of the Board meeting on *593 January 7, 2003, indicate that the Club considered holding extra public events to avoid a budget shortfall. The June 12, 2000 Treasurer’s Report indicates that the Club planned to increase income from public functions to pay for improvements to the Club’s facilities.
Use of the Club’s golf course is governed by the golf rules, a copy of which is distributed yearly to members and applicants. The rules outline the different categories of golf membership. An individual who is on the wait list for golf membership may play golf once per calendar month, Monday through Friday only; however, it is the Club’s practice to also allow these individuals to play in tournaments. All members of the Club, regardless of gender, are eligible to become A or B bondholder members. An option A bondholder may play anytime except Tuesday mornings until 11:30 a.m. and on Wednesday mornings on the side of the course exclusively designated by the golf professional. An option B bondholder may not play before 10:30 a.m. on Saturdays, Sundays, and holidays, but may play on Tuesday and Wednesday mornings. Section III(l) of the General Golf Rules states that there shall be separate men’s and women’s golf programs. No male member or male guest may play in any event sponsored by the women’s golf program, and no female member of a female guest may play in any event sponsored by the men’s golf program. Most of the women members are spouses of male bondholders and choose not to become bondholders because the annual fee for the woman spouse golf membership is about ten percent less than the full bondholder fees and dues.
On June 26,2000, Murray submitted her application to become a member of the Club. Shortly thereafter, the Board approved her application, and her name was placed on the waiting list. Murray was on the wait list for almost two years. In May of 2002, Murray learned that a Mr. Chris Petrini had become a member of the Club without having to wait on the list. Murray was upset about someone being advanced over her and addressed her concerns with Club President Dave Sullivan (“Sullivan”). Sullivan informed the plaintiff that Petrini had received membership status because he was a close friend of a former president of the Board. After discussing Petrini’s membership with other members and employees of the Club Murray learned that this was not the first time an individual’s membership had been advanced because of their relationship with someone on the Board. Murray thought Mr. Petrini’s advancement revealed a discriminatoiy practice by the Club and brought a complaint to the Board. In the past ten years, there have been eleven incidents in which an applicant’s membership has been advanced over those who have been on the wait list longer. Of these eleven, two were men and nine were females.
While Murray was on the wait list, Harvey Katzen (“Katzen”), a member of the club, approached Murray and stated that he could get her name moved to the top of the waiting list in exchange for sexual favors. Although Murray believed Katzen to be an officer of the Club, he was actually the Chairman of the Rules Committee, not an officer. Murray reported this incident to Sullivan. At the time, Murray refused to disclose to Sullivan the name of the individual involved and requested a meeting with the Board. During the meeting with the Board, Murray became uncomfortable discussing the incident in front of all the members. To address this, the Board appointed two members to a subcommittee to investigate the incident.
During a meeting with the subcommittee, Murray revealed that it was Katzen who had made this proposition to her. After further investigation, the subcommittee found that Katzen had behaved in an unacceptable manner and that other women who belonged to the Club found his behavior suggestive and offensive. The Board placed a letter in his file stating such.
In a letter dated August 3, 2002, Murray informed the Board that she intended to drop the sexual harassment complaint against Katzen, but planned to continue with her complaint regarding the Club’s unfair wait list policy. On August 6, 2002, the Board voted to deny Murray membership to the Club. The Board denied her membership because they found her statement, that an officer of the Club had sexually harassed her, was false and slanderous, because Katzen was not an officer of the Club but a chairman of a committee. The Board also thought that some of her behavior at social functions had been inappropriate. On September 26, 2002, the Club sent a letter to Edward Var-richione, a member of the Club who invited Murray to the Club as a guest, indicating that Murray was no longer allowed on the Club’s property. On September 5, 2002, Murray filed a complaint with the MCAD, and filed a civil claim on December 19, 2003.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1982); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with and allege specific facts establishing the existence of a *594 genuine issue for trial. Pedersen, 404 Mass, at 17. The opposing party cannot rest on mere assertions of disputed facts to defeat the motion. Lalonde v. Eissner, 405 Mass. 207, 209 (1989).
A. Public Accommodation
The defendant contends that because it is a private club, it is not subject to G.L.c. 272, §§92A and 98. Chapter 272, §98 states that “[w]hoever makes any distinction, discrimination or restriction on account of sex . . . relative to the admission of any person to, or his treatment in, any place of public accommodation, resort or amusement, as defined by section ninety-two A . . . shall be punished . . . and shall be liable to any person aggrieved thereby for . . . damages.” Chapter 272, §92A defines “a place of public accommodation, resort or amusement as any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public.”
In Concord Rod and Gun, Inc. v. Massachusetts Comm’n Against Discrimination, 402 Mass. 716 (1998), the Supreme Judicial Court considered whether a private, non-profit fishing and hunting club for men was a place of public accommodation. The fishing club’s membership was limited to 300 and its principal source of income was its membership dues. Id. at 719. An applicant to the club needed to obtain signatures from three club members to be eligible for membership, although there was no requirement that the members knew the applicant. Id. In addition, the Board had to interview and approve the applicant. Id. The Board had only denied three applications in a fifteen-year period. Id. The Court found that the Club was a place of public accommodation because there was a “total absence of genuine selectivity in membership.” Id. at 721. The Court noted that the Club’s geographic and numerical limitations on membership, lack of advertisements, and non-profit status did not outweigh the absence of selectivity. Id.
In considering whether a private club can be a place of public accommodation, the lower courts have reached varying conclusions. In Soltys v. Wellesley Country Club, 2002 WL 31998398 *1 (Mass.Super. 2002) (15 Mass. L. Rptr. 650), the plaintiffs were a couple on awaiting list at a private nonprofit golf club. The wife alleged that the Club’s practice of allowing men on the waiting list to play in men’s group tournaments, while prohibiting women on the wait list from playing in women’s tournaments, was discriminatory and violated G.L.c. 272, §§92A and 98. Id. at *3. The Soltys court held that while selectivity of membership was the most important consideration in determining public accommodation status, other factors that could be considered included: (1) membership control; (2) history of the organization; (3) use of the facility by non-members; (4) the extent of revenues from non-members; (5) whether the facility advertised to the public; and (6) the formality observed by the club. Id. at *6, citing United States v. Lansdowne Swim Club, 713 F.Sup. 785, 796-97 (E.D.Pa. 1998); Jankey v. Twentieth Century Fox Film, 14 F.Sup. 1174, 1179 (C.D.Cal. 1998). The court found that the club’s membership process was genuinely selective because potential members needed to obtain applications from an existing member, be known to and proposed by at least three members, and be approved by at least fourteen out of fifteen members. Id. The court also held that 3.3% of revenue obtained from public groups, and 11.7% of revenue from guests was not significant enough to make the club a place of public accommodation. Id. at *7
In contrast, the court in Wanders v. Bear Hill Golf Club, Inc., 1998 WL 1181150, No. 971458 (Mass.Super. 1998), found a golf club to be a place of public accommodation. The plaintiffs in Wanders were female members of a private golf club who wanted to play in weekend golf tournaments. Id. at * 1. The club’s golf rules prohibited women from playing during certain hours on the weekend, essentially depriving working women the opportunity to play when their work schedules would allow. Id. The club was a place of public accommodation because: 1) it did not seem to follow a discernible selection pattern and had not rejected an applicant in three years; 2) it allowed non-member groups, whose make up it could not control, to use its premises; 3) it advertised the availability of its banquet service to the fee-paying public; and 4) although only 5.4% of the club’s revenue came from non-member use, the club relied on the revenue to avoid running a deficit. Id. at *2.
It is clear that selectivity of membership is critical to the determination of whether a private club is a place of public accommodation. Here, an application for membership must be signed by two members of the Club, but there is no requirement that the members know the applicant. While the Bylaws require that seven out of nine Board members approve an applicant’s membership, only two applicants, including the plaintiff, have been rejected over the past ten years. In addition, the Club’s website solicits membership from the public and advertises tournaments that are open to the public.
Furthermore, the Club hosts various public functions, including golf tournaments for fund-raisers and allows local golf groups to use the facilities. Although the income it receives from the public is less than one percent of its overall revenue, the Club relied on such income to pay for improvements to the Club’s facilities and to avoid budget short falls.
The evidence before this Court shows that, at the very least, there are genuine issues of material fact as to the Club’s selectivity of the membership, its availability and marketing to the public, and its reliance on funding from the public. Therefore, whether the Club is a place of public accommodation is a question best left for a jury.[4] Accordingly, the defendant’s motion for summary judgment on this count is denied.
*595 B. Statute of Limitations[5]
The defendant alleges that the plaintiffs claims under G.L.c. 151B claims regarding the Club’s golf rules are barred by the statute of limitations. Chapter 15 IB, §5 requires that an action be filed with the MCAD within six months of the discriminatory event. Carter v. Commissioner of Correction, 43 Mass.App.Ct. 212, 217 (1997). The statute of limitation in a discrimination claim does not begin to run if the plaintiff has hope that the situation will improve. Bourne, 58 Mass.App.Ct. at 312. However, when it is “apparent or should be apparent to a person with a reasonably prudent regard for his rights” that she is being discriminated against and the situation will not improve, then the statute of limitations begins to run. Adamczyk v. Augat, Inc., 52 Mass.App.Ct. 717, 720 (2001).
The defendant alleges that the plaintiff should have filed an MCAD complaint within six months after she first received the golf rules in 2000, because it was at that time that a reasonably prudent person would have known that her rights were being violated. The plaintiff contends that she was unaware of the discriminatory affect of the golf rules until after she filed her MCAD complaint because she was not aware that under the rules male applicants were allowed more opportunities to participate in golfing tournaments than their female counterparts. The only evidence that the defendant offers to counter Murray’s position is that it in fact mailed her the golf rules in 2000 and 2001. Whether a reasonable person should have been aware that her rights were being violated when the golf rules were mailed out in 2000 is a question of fact for the jury.[6]
C. Discrimination Claims
1. Golf Rules[7]
Murray alleges that the golf rules have a disparate impact on women on the waiting list. The golf rules state that an individual who is on the wait list for golf membership may play golf once per calendar month, Monday through Friday only. However, it is the Club’s practice to also allow these individuals to play in tournaments. Hie Club’s golf rules also state that women cannot play in men’s tournaments and men are not allowed to play in women’s tournaments. When these two rules are applied together, there is a potential for a disparate impact for women on the waiting list. Because the men’s group usually holds tournaments on weekends, and the women’s group holds tournaments on weekdays, it would seem that women on the waiting list would be deprived the opportunity to play on weekends, while men on the waiting list could play in numerous weekend tournaments, giving men on the wait list more preferential playing time. The defendant offers no evidence to counter the allegation that as applied the rules have a disparate impact on female members and applicants. “Discrimination cases are often bound up in the sort of factual inquiries best left to a jury. Through circumstantial evidence, parties seek to prove motive and intent, issues least suited for a determination on a motion for summary judgment.” Ruffino v. State Street Bank and Trust Co., 907 F.Sup. 1019, 1028 (D.Mass. 1995). Accordingly, the plaintiffs claim regarding the disparate impact of the Club’s golf rules survives summary judgment.
2. Membership Application Process
The plaintiff also argues that the Club engaged in discrimination based on sex in its membership application process. Murray argues that because the Board awarded a membership to Mr. Petrini in advance of her application and without requiring that he be placed on the wait list the Club discriminated against her because of her sex. The defendants have presented undisputed evidence that while the Club does have a practice of taking applicants on the waiting list out of order, the majority of these instances have been female applicants being advanced over male applicants. The defendant contends that Petrini’s membership was advanced over the plaintiffs because he was a close acquaintance of a former president of the Club. Hie plaintiff has failed to present any evidence of a discriminatory reason (or impact) for Petrini’s advanced membership. Accordingly, the defendant’s motion for summary judgment regarding its application process is allowed.
D.Retaliation
Chapter 151B, §4(4), prohibits retaliation by making it unlawful “to discharge, expel or otherwise discriminate against a person” because she opposed any discriminatory practices outlined in G.L.c. 151B. Even if the plaintiff does not succeed on her discrimination claim, a jury can still find retaliation. Abramian v. President and Fellows of Harvard College, 432 Mass. 107, 121-22 (2000). In order to prove retaliation, the plaintiff must show that she reasonably and in good faith believed that the Club was engaged in a discriminatory practice, she acted reasonably in response to her belief, and the Club voted to deny her membership and access to Club property in retaliation against her for challenging its application procedures. Tate v. Department of Mental Health, 419 Mass. 356, 364 (1995). Hie presence of retaliation is largely a factual matter for the jury. Bain v. City of Springfield, 424 Mass. 758, 764-65 (1997).
Before Murray was denied membership to the Club and prohibited from entering the Club’s property, she filed a grievance with the Board concerning her belief that the Club had engaged in gender discrimination when it advanced Petrini’s membership over hers. Murray believed that the Board allowed Petrini to become a member without waiting on the list because the Board members gave special privileges to their male friends. At the time Murray brought her complaint to the Board, she was not aware of any instances in which females had been advanced over other applicants because of their connection to Board Members or Officers of the Club. She had also received information from members and employees that there had been a few instances when other male applicants had been advanced because of their personal connection to members of the Club. Based *596 upon her beliefs, she filed a complaint with the Board to ask them to examine their application procedures.
The Club argues that it did not deny Murray membership to the Club because of her complaint about the application procedures, but rather because her allegation that an officer had sexually harassed her was slanderous and her behavior at social functions was inappropriate. The record reveals genuine issues of material fact concerning Murray’s reasonableness in believing the Club’s application process was discriminatory, and the Club’s reasons for denying her application. Accordingly, the defendant’s motion for summary judgment on the plaintiffs retaliation claim is denied.
ORDER
Based on the foregoing, it is hereby ORDERED that the defendant’s motion for summary judgment is ALLOWED in part, and DENIED in part.

The plaintiff failed to submit a timely statement of material facts in accordance with Rule 9(A)(bX5). Her belated effort to file a late statement has been denied because the excuse offered for the late filing is simply not credible given the representations made by plaintiffs counsel during the hearing on the summary judgment motion. Accordingly, the material facts presented by the defendant in accordance with Rule 9(A) shall be deemed admitted for the purpose of this summary judgment motion. See Sullivan v. Liberty Mutual Ins. Co., 444 Mass. 34, 48 n. 18 (2005) (holding that for the purposes of the motion for summary judgment, the facts contained in the moving party’s statement of facts shall be deemed to have been admitted unless controverted in the manner set forth in Rule 9(A)).

There is no requirement concerning the length of time that a member is required to know an applicant and no policy on the degree of familiarity that the member must have with the applicant.

 A bondholder at the Club pays a $12,500 bond, $17,000 initiation fee, $3,825 in annual dues, and $7,825 on golfing, food and beverages a year.

In cases where the courts have decided at the summary judgment stage whether a private club is a place of public accommodation, both parties have moved for summary judgment on the issue. See, e.g., Wanders, 1998 WL 1181150; Soltys, 2002 WL 31998398. See also Bourne v. Haverhill Golf and Country Club, Inc., 58 Mass.App.Ct. 306 (defendant did not challenge jury’s finding that club was a place of public accommodation); Donaldson v. Farrakan, 436 Mass. 94 (2002).

The plaintiffs claims under G.L.c. 271 are not subject to the six-month MCAD filing requirement.

In addition, even if the jury were to find that the plaintiff should have been aware of the discriminatory nature of the golf rules and the affect on her in 2000, the plaintiff may still have filed a timely claim under the continuing violation doctrine. “The six-month requirement shall not be a ban to filing those instances where the facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature.” Lynn Teachers Union, Local 1037 v. Massachusetts Commission Against Discrimination, 406 Mass. 515, 520 (1990). Because the golf rules were in effect throughout Murray’s application period, and their application allegedly resulted in a discriminatory impact on female members and applicants, her claim could fall under the protection of the continuing violation doctrine.

The plaintiff claims that certain practices relating to option A bondholder status also have a disparate impact on women. Murray was not a bondholder, and, therefore, does not have standing to make that claim.