# United States Court of Appeals
## For the First Circuit

---

No. 00-1237

CALVIN L. KEELER,

Plaintiff, Appellant,

v.

PUTNAM FIDUCIARY TRUST COMPANY,
PUTNAM INVESTMENTS, INC.,
MARSH & McLENNAN COMPANY, INC.,
JACK CHAFIN and GAVAN TAYLOR,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

---

Before

Torruella, Chief Judge,

Bownes, Senior Circuit Judge,

and Boudin, Circuit Judge.

---

    Elizabeth A. Rodgers with whom Robert Mantell and Rodgers, Powers & Schwartz were on brief for appellant.
    Laura Steinberg with whom Samia M. Kirmani, Kathleen A. Collins and Sullivan & Worcester LLP were on brief for appellees.

January 17, 2001

BOUDIN, Circuit Judge. This appeal grows out of a lawsuit by Calvin Keeler against Putnam Investments, Inc. ("Putnam") and others. Keeler charged Putnam with age discrimination under state law, violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-54 (1994 & Supp. II 1996), and other alleged wrongs. The district court gave summary judgment for the defendants on all but one state-law claim, which it remanded to state court, and Keeler has now appealed. We begin with a brief outline of events, giving due preference to Keeler's version of the facts.

In 1987, Gavan Taylor, a senior executive at Putnam, recommended hiring Keeler--then 57 years of age--to manage Putnam's mainframe computer services functions. Keeler's title was senior vice president. During the period 1987-1993, Keeler was highly rated in Putnam's regular evaluations. His base salary grew to just over $90,000 and he received year-end bonuses ranging up to $33,100. However, as early as 1990, Keeler's responsibilities were narrowed to focus on data communications and other new technology, and some of his staff were reassigned.

In August 1993, Taylor hired a new senior vice president, Jack Chafin (age 49) to manage data communications. Keeler lost another chunk of his staff, and his duties were

limited to computer-related planning, disaster recovery, data security, and some administrative tasks. Although he had once had as many as 85 or more employees to supervise, his new duties after August 1993 left him with only about five employees. However, Keeler remained a senior vice president with the same salary. At the end of the year Keeler got a very good performance evaluation and a sizable $33,000 bonus but, unlike other senior vice presidents, he did not get any appreciable raise in salary.

In 1994, Taylor told Keeler that he would not receive his usual large bonus at the end of the year because of his reduced duties. In December 1994, Keeler was redesignated vice president and lost the accouterments of a senior vice president (a large office, reserved parking). His year-end bonus, now based on a less favorable bonus plan, shrank to $7,300. His job evaluation for the year (made in January 1995), although still adequate (3+), fell from the higher ranking (4) that he had previously enjoyed (the maximum was 5). In December 1994, concerned about possible age discrimination, Keeler contacted a lawyer whom he knew had represented employment discrimination plaintiffs.

In 1995, Keeler was assigned to work on a significant project to provide Internet access to Putnam employees; but,

after some controversy about his handling of the project, he was removed in mid-1995. Disagreement also arose about Keeler's handling of another matter involving Putnam's response to audit inquiries. Chafin's mid-year assessment graded Keeler's performance at a lower level (3), and in the fall Taylor told him that his rating would be downgraded further (to 2). When the physical condition of Keeler's wife deteriorated in December 1995, Keeler began to take periods of leave to care for her.

Keeler received no bonus for 1995 and, in 1996, another controversy arose about a delay in completing a local area network security audit. In March 1996, Chafin removed Keeler from supervision of disaster recovery and data security. On March 20, 1996, Keeler filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"), claiming age discrimination. By a letter of March 29, 1996, Keeler advised Putnam of the complaint and asked for a substantial change in position or a substantial severance package. After receipt of the letter, Putnam, on April 2, 1996, escorted Keeler from the premises and placed him on paid leave. Within a week, Putnam withdrew the suspension, after Keeler's attorney warned Putnam that its action represented retaliation.

During this period and continuing through the rest of 1996, Putnam's wife was repeatedly hospitalized. Keeler took

more than 30 days away from work to care for her or as personal sick days, and the company always approved his absences. At the same time, Keeler was given new projects. However, in February 1997, Keeler received a low performance rating (2+) and his review noted that Keeler's "[a]ttendance [was] unpredictable in 1996 and part of 1995." Keeler asked Putnam to change the evaluation, provide him a performance improvement plan, and reinstate him as a senior vice president. Putnam declined. Keeler resigned on March 21, 1997.

In May 1998, Keeler brought suit against Putnam in Massachusetts state court.[1] The complaint set forth six claims under Massachusetts law: intentional age discrimination (count I) and disparate-impact age discrimination (count II), Mass. Gen. Laws ch. 151B, § 4 (1998); retaliation following his complaint (count III), id. at §§ 4, 4(4); failure to investigate and remedy discrimination (count IV); violation of Massachusetts' Equal Rights Act because of age discrimination (count V), Mass. Gen. Laws ch. 93, § 103 (1998); and defamation (count VI). A seventh, federal claim was for discrimination in violation of the Family and Medical Leave Act (count VII).

---

[1]Also named as defendants were Putnam's subsidiary, Putnam Fiduciary Trust Co.; Putnam's corporate parent, Marsh & McLennan Co.; and Gavan Taylor and Jack Chafin. For simplicity, we refer to Putnam as the defendant.

Putnam removed the case to the district court and, after extensive discovery by both sides, Putnam moved for summary judgment on August 10, 1999. For reasons more fully explained below, the district court granted summary judgment to Putnam on all counts other than retaliation and remanded that count to state court (because of difficult issues of state law as to exhaustion and the statute of limitations). Keeler now appeals from the grant of summary judgment only as to the counts charging intentional age discrimination, failure to investigate, and medical leave discrimination (counts I, IV, and VII).

Our review on a grant of summary judgment is de novo, Landrau-Romero v. Banco Popular de Puerto Rico, 212 F.3d 607, 611 (1st Cir. 2000), and we begin with the sole federal claim. Under the Family and Medical Leave Act, Keeler was entitled to take "a total of 12 workweeks of leave during any 12-month period" to care for a spouse suffering from a "serious health condition," 29 U.S.C. § 2612(a)(1), and, more to the point, Putnam could not lawfully "interfere with, restrain, or deny" Keeler's exercise of this right, id. § 2615(a)(1). Regulations, not here challenged, prohibit an employer "from discriminating against employees . . . who have used FMLA leave" or from using such leave "as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. §

825.220(c) (2000); accord Hodgens v. General Dynamics Corp., 144 F.3d 151, 159-60 (1st Cir. 1998).

The district court began its analysis with the framework adopted in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), which involved a Title VII claim that racial discrimination underlay a denial of employment. The decision held that, following a rather low threshold showing by the would-be employee, an employer has an obligation to "articulate some legitimate, nondiscriminatory reason for the [applicant's] rejection," absent which discrimination may be presumed. Id. at 802. With necessary adjustments to the threshold showing, McDonnell Douglas has been adapted to other kinds of discrimination claims, including FMLA claims.[2]

When McDonnell Douglas applies, the employer normally seeks to proffer some colorable nondiscriminatory reason for the challenged action. The plaintiff may then say that the reason is pretext and the true reason is forbidden discrimination. McDonnell Douglas, 411 U.S. at 804. In that event, depending on the record, there may or may not be legitimate issues for a

---

[2]Hodgens, 144 F.3d at 160 (FMLA); see also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000) (sex discrimination); DeNovellis v. Shalala, 124 F.3d 298, 308 (1st Cir. 1997) (age discrimination included); Katz v. City Metal Co., 87 F.3d 26, 30 n.2 (1st Cir. 1996) (disability-based discrimination).

factfinder as to the true motive, causation and injury. But the adverse presumption disappears, and the plaintiff retains the ordinary burden of proving discrimination. See Lawrence v. Northrop Corp., 980 F.2d 66, 69-70 (1st Cir. 1992).

By the time summary judgment was sought, Putnam had advanced a host of nondiscriminatory reasons for its challenged actions. Based on deposition and documentary evidence, Putnam painted a picture of Keeler failing in a series of important assignments from 1993 onward, of efforts by the company to protect his pay and status while getting others to carry on the work, and of Keeler failing to admit his weaknesses as a manager or to undertake to correct them. Of course, most of the evidence came from Putnam's officials and could be challenged, but certainly Putnam colorably "explained" with nondiscriminatory reasons the adjustment in pay status and evaluations it gave Keeler following his use of FMLA leave.

The district court did not decide the issue of motive. Instead, it concluded that Keeler had not satisfied a different condition that the court said was necessary to "a prima facie case under the FMLA," namely, the requirement that Keeler have suffered "an adverse employment action" arguably ascribable to his use of FMLA leave. It is not clear whether the court regarded this as part of the McDonnell Douglas threshold showing

-9-

or as part of the showing that a plaintiff must make to avoid summary judgment <u>after</u> the defendant's "burden" of explanation has been met.[3]  In all events, Keeler does not dispute that to avoid summary judgment he had to create a trialworthy issue that Putnam had taken adverse employment action against him that was motivated at least in part by Keeler's use of protected leave.

In finding that no such trialworthy issue had been created, the district court took Keeler to be claiming that he suffered an adverse employment action after he took leave because his absences were reflected in negative reports and evaluations of his performance in 1996.  The court said that negative performance evaluations were not themselves adverse employment actions, <u>Sweeney</u> v. <u>West</u>, 149 F.3d 550, 556 (7th Cir. 1998); and, taking Keeler to argue further that these evaluations contributed to his "constructive discharge," the court said that, as a matter of law, a reasonable person would not take these incidents as creating "intolerable working

---

[3]The courts have often used the term "prima facie" with respect to <u>both</u> showings, <u>compare</u> <u>Ward</u> v. <u>Massachusetts Health Research Inst., Inc.</u>, 209 F.3d 29, 32-33 (1st Cir. 2000), <u>with</u> <u>Hodgens</u>, 144 F.3d at 160-61, and the frequent failure to identify <u>which</u> showing is at issue has bred substantial confusion--which is enhanced because the two showings have some common elements while differing in other respects (or else <u>McDonnell Douglas</u> would serve no function at all).

conditions" amounting to constructive discharge. We think that the reasoning does not quite work but the grant of summary judgment was right.

Part of the confusion is due to the fact that Keeler, in opposing summary judgment, argued emphatically he had suffered a "constructive discharge." This was always a dubious argument since "constructive discharge" usually describes harassment so severe and oppressive that staying on the job while seeking redress is intolerable. Landrau-Romero, 212 F.3d at 613; Ramos v. Davis & Geck, Inc., 167 F.3d 727, 732-33 (1st Cir. 1999). Here, none of Putnam's actions were of such magnitude that Keeler was prevented from staying on while seeking remedies for any harm he had suffered. See Nunez-Soto v. Alvarado, 918 F.2d 1029, 1030-31 (1st Cir. 1990).

We also agree with Sweeney, 149 F.3d at 556, that not every comment about problems created by the use of leave can fairly be treated as an adverse employment action violating the FMLA. An employee's use of leave, while fully legitimate, can cause serious problems for the employee's performance of his tasks and require an employer to implement changes in how jobs are assigned and who does what within the organization. What is prevented is adverse action against the employee for using the protected leave. See 29 C.F.R. § 825.220(c). But in opposing

-11-

summary judgment, Keeler <u>did</u> allege two different types of concrete injury never addressed by the district court:

•that the loss of his remaining staff and important functions in March 1996 was due in part to displeasure at his use of FMLA leave and, that while this motivation was not expressed to him at the time (and he then thought that age discrimination was the reason), a private April 1996 memorandum refers to absence problems; and

•that the absences, mentioned again in the year-end evaluation of his 1996 performance, resulted in his low "2+" rating which (he says) was an understood threat of dismissal, to which he yielded in order to retain lifetime health benefits.

On appeal, Keeler's opening brief mentions neither of the above injury claims in the context of his FMLA argument but, in addition to repeating the constructive discharge claim, offers a <u>new</u> claim of injury, namely, that the low "2+" rating allegedly disqualified Keeler from eligibility for a bonus for his 1996 work and that concern over absences may also explain the failure to give him a bonus for 1995 work (even though the downturn in his wife's health that triggered his taking significant FMLA leave did not occur until December 1995). Keeler refers to his <u>earlier</u> district court allegations of injury only briefly and in his reply brief in this court.

Certainly, it would have been better for the district court to have addressed the two specific injury claims Keeler

made in opposing summary judgment.  But these claims are forfeit on appeal because neither one is renewed in Keeler's opening brief, which instead offers a new claim of injury not made in the district court and now unavailable.  <u>Wills</u> v. <u>Brown Univ.</u>, 184 F.3d 20, 27 (1st Cir. 1999).  The brief mention of one of the older claims in a reply brief is inadequate; "[e]ven if preserved below, the argument has to be renewed in the opening brief on appeal, so that the appellee has a chance to respond." <u>Id.</u>

There are no "extraordinary circumstances" that prompt us to go beyond the claims properly made on appeal.  <u>Gemco Latinoamerica, Inc.</u> v. <u>Seiko Time Corp.</u>, 61 F.3d 94, 100 (1st Cir. 1995).  FMLA leave may have played some part in the final stages of Keeler's deteriorating relationship with Putnam, but Keeler's loss of responsibilities and staff, his ever lower rating, and the elimination of bonuses are part of a downward trajectory that began long before he began to take FMLA leave in late 1995.  Whether the trajectory was itself due to age discrimination is a different question, to which we now turn.

Keeler's main age discrimination claim is that his successive reverses from 1993 onward--in responsibilities, title, salary, bonuses and perquisites--were caused by Putnam's view that he (Keeler) was too old for his job.  The district

court narrowed the incidents it would consider to those that occurred not earlier than six months prior to Keeler's initial complaint to MCAD in March 1996; it excluded certain of the age-related statements that Keeler attributed to Putnam on the ground that they were not offered by firsthand affidavit or deposition; it then concluded--as to the remaining adverse actions--that "the overwhelming evidence of record [showed] that [Keeler] did not meet his employer's legitimate performance expectations" and that a stray remark of 1993 allegedly made by Taylor about Keeler being at retirement age did not create a jury issue as to motive.[4]

On appeal, Keeler says that the district court should not have narrowed the scope of the incidents it considered, and that, even if the scope of inquiry was properly limited to events in 1996 and thereafter, enough evidence of age discrimination remained for a jury trial. Keeler also attacks the district court's decision to exclude other alleged statements bearing on age discrimination that were unsupported by first person affidavits or depositions, but the arguments for reversal on this issue are not substantial. By contrast, the

---

[4]According to an affidavit from a former Putnam employee, Taylor allegedly said that because Keeler was "at the age of moving into retirement, he . . . was looking to bring in other individuals to take over the functions that [Keeler] had under his domain."

-14-

statute of limitations and the judgment as to the weight of the evidence both raise difficult questions.

In addressing the limitations issue, the district court set out in chronological order a parade of thirteen incidents claimed by Keeler to involve adverse actions, beginning with the loss of some of his responsibilities in 1990. The court then said that the first nine incidents occurred more than six months before March 1996 when Keeler filed his MCAD complaint and that these earlier incidents could not be used "to support" his claims of discrimination. Keeler has claimed throughout that such pre-1996 incidents could be the basis for recovery on a "continuing violation" theory recognized under both Massachusetts and federal decisions. E.g., Thomas v. Eastman Kodak Co., 183 F.3d 38, 53-54 (1st Cir. 1999), cert. denied, 120 S. Ct. 1174 (2000); Lynn Teachers Union v. MCAD, 549 N.E.2d 97, 100 (Mass. 1990).

The continuing violation concept has provoked endless confusion, 2 Lindemann & Grossman, Employment Discrimination Law 1351 (3d ed. 1996), but if what Keeler characterizes as the "federal" approach were taken, the concept would not help Keeler in this case. This court has treated the concept primarily as a tolling device, allowing a plaintiff to reach back to recover for earlier related incidents--otherwise barred by a statute of

limitations--where at the time they occurred the plaintiff had no reason to know that a wrong had been committed. <u>Provencher</u> v. <u>CVS Pharmacy</u>, 145 F.3d 5, 14-15 (1st Cir. 1998); <u>Sabree</u> v. <u>United Bhd. of Carpenters & Joiners Local No. 33</u>, 921 F.2d 396, 402 (1st Cir. 1990). Here, Keeler admitted that by 1994, long before he filed his complaint, he already suspected that age discrimination was at work.

However, Massachusetts law governs here and (according to Keeler) is more generous to plaintiffs. Frankly, we are uncertain. An MCAD regulation bearing on the question, Mass. Regs. Code tit. 804, § 1.10(2) (1998), is ambiguous; the decisions of the Supreme Judicial Court to which we have been cited do not clearly resolve the issue; and lower court decisions in Massachusetts are divided: several follow the federal approach, but one judge predicts that the SJC would override the limitations period in certain continuing violation cases where the federal approach would not.[5] Absent clearer

---

[5]<u>Compare</u> <u>Clifton</u> v. <u>Massachusetts Bay Transp. Auth.</u>, No. Civ.A. 95-2686-H, 2000 WL 218397, at *5-*6 (Mass. Super. Ct. Feb. 3, 2000) (Gants, J.) (rejecting the federal approach), <u>and</u> <u>De Almeida</u> v. <u>The Children's Museum</u>, No. Civ.A. 99-0901-H, 2000 WL 96497, at *5 (Mass. Super. Ct. Jan. 11, 2000) (Gants, J.) (same), <u>with</u> <u>Cuddyer</u> v. <u>Stop & Shop Supermarket Co.</u>, No. Civ.A. 97-01816, 2000 WL 343783, at *8 (Mass. Super. Ct. Mar. 15, 2000) (adopting the federal approach), <u>and</u> <u>Riebold</u> v. <u>Eastern Cas. Ins. Co.</u>, No. Civ.A. 000306, 1999 WL 140419, at *7 (Mass Super. Ct. Mar. 2, 1999) (same).

guidance from Massachusetts courts, we will follow the well-established <u>Provencher</u> and <u>Sabree</u> approach in cases like this one governed by Massachusetts law.  <u>Cf.</u> <u>Kassel</u> v. <u>Gannett Co.</u>, 875 F.2d 935, 949-50 (1st Cir. 1989).

Even if it is supposed that the SJC may take a more plaintiff-friendly approach, this is more likely to occur in cases of ongoing harassment where pinpricks may only slowly add up to a wound.  Here, by contrast, Keeler suffered a sequence of fairly discrete and individually major adjustments in pay, title, responsibilities, and the like; and it is not easy to see why an MCAD complaint should have been deferred once Keeler concluded in 1994 that age discrimination might underlie some of these actions.  Of course, Keeler may still use the earlier events as background evidence of discrimination even where he cannot recover for them.  <u>Sabree</u>, 921 F.2d at 400 n.9.

This brings us to the next issue:  whether Keeler had enough evidence of age discrimination causing adverse action to get to a jury once the statute of limitations barred his recovery for incidents prior to September 1995 (<u>i.e.</u>, six months before his MCAD complaint was first filed).  The issue is closer than the district court realized because among the nine incidents that it excluded from consideration on statute of limitations grounds, one was not an employment action at all but

rather an alleged statement by Taylor that goes to motivation. According to Keeler, Taylor told Keeler on August 9, 1993, the day after Keeler turned 63, that "due to his age he . . . would be given less responsibility at the same pay . . . and with the same title, and that his job would be less stressful."

Adding this to the remark about Keeler's being at retirement age, there were two admissible statements suggesting discriminatory intent that Taylor allegedly made in 1993. If we were concerned with adverse actions taken against Keeler close in time to these statements, a case might exist for a jury, especially because up to that point in 1993, Keeler's evaluations were good, with few complaints about his performance. Thus, the appointment of Chafin in 1993 to supervise data communications and the reduction of Keeler's staff by roughly 25 members might have created a jury issue as to age discrimination, even though Putnam has its own explanations for the change (burgeoning workload, Chafin's special expertise in managing information systems). But, of course, this 1993 revision of duties is one of the incidents excluded by the statute of limitations ruling as a basis for recovery.

By contrast, at the time of the incidents in late 1995 that fall within the statute of limitations, Keeler's

performance rating had been declining for some time, and persons other than Taylor had criticized Keeler's work on various projects. From late 1993 on, the evaluations for the most part were made by Chafin, who has not been taxed with having made any age-related comments; similarly, the complaints about Keeler's performance, although less substantial than Putnam asserts, have also not been shown to be linked to age discrimination.[6] Whether they were fair criticisms or attempts to shift blame for delays on difficult projects is beside the point, so long as they were not age-motivated.

In the end, we think no reasonable jury could attribute the adverse actions from late 1995 onward to two alleged remarks made in 1993, at least one of them quite ambiguous (as Keeler admits). Here, there exists in the interim a record of performance-related criticisms, principally by or to Chafin (not Taylor); and there is a telling lack of substantial, specific evidence that Keeler was treated differently from younger but otherwise similarly situated employees. On this record the

---

[6]Keeler received mixed reviews while working on the so-called "Artemis" project involving computer software. Chafin was also concerned that Keeler had difficulties in completing the company's project to provide Internet access to employees, that Keeler had not completed the last two stages of a capacity planning project, and that he did not complete another project for Putnam's Andover office. Finally, Janet Green, another employee, complained about mistakes made by Keeler during an audit.

district court was entitled to grant summary judgment as to the age discrimination claim. See Wooster v. Abdow Corp., 709 N.E.2d 71, 76-78 (Mass. App. Ct. 1999); Tardanico v. Aetna Life & Cas. Co., 671 N.E.2d 510, 514-15 (Mass. App. Ct. 1996).

We turn now to count IV of the complaint charging Putnam with failing to conduct an adequate investigation of Keeler's age discrimination charge after Keeler (in April 1996) complained inside the company that he was a victim of such discrimination. Putnam says that the record shows that Putnam did make a good faith investigation as soon as Keeler made the charge. The district court did not resolve the contest but instead granted summary judgment for Putnam on the ground that the court's rejection of the substantive age discrimination claim precluded liability for a failure to investigate.

On appeal, Keeler claims that "[t]he duty to investigate . . . may form an independent basis for liability," but the Massachusetts decisions he cites are of relatively little help to him. In College-Town, Division of Interco, Inc. v. MCAD, 508 N.E.2d 587, 594 (Mass. 1987), the SJC did indeed refer to a duty to investigate; but it did so in explaining why the defendant company could be held liable for sexual harassment that had been committed by a supervisor, reported by the victim to higher management, and not adequately investigated or curbed.

-20-

Nothing in the opinion suggests that, if there had been no sexual harassment, the failure to investigate claim could have given rise to any independent liability.[7]

Nothing would prevent a legislature from enacting a statute that required an employer to investigate colorable claims, and that awarded damages (if any) for the failure to do so, even where no substantive discrimination had occurred. However, nothing in the Massachusetts statute suggests such an intention to us, and the reference in College-Town to the duty to investigate makes far more sense as a further explanation for imposing liability on an employer who was told correctly that harassment had occurred but did nothing to prevent it. And, of course, the damages for failure to investigate would be quite different in character and amount than the type normally awarded for discrimination.

Finally, the district court did not rule on the merits of count III, the retaliation claim, but remanded it to the state court. The federal claim having been dismissed, the district court deemed a remand appropriate partly because of

---

[7]Keeler also cites Moore v. Boston Fire Dep't, 22 M.D.L.R. 294, 299-301 (MCAD 2000); Beldo v. University of Mass. Boston, 20 M.D.L.R. 105, 112 (MCAD 1998); Kenney v. R & R Corp., 20 M.D.L.R. 29, 32 (MCAD 1998); and DiSilva v. Polaroid Corp., 1985 Mass. App. Div. 1, 4 (1985). However, none of these cases even arguably extends the holding in College-Town.

-21-

some uncertainty under state law as to whether the retaliation claim had been adequately preserved.  Neither Keeler nor Putnam has challenged this disposition and we leave the remand undisturbed.

The judgment of the district court is <u>affirmed</u>.  Each side shall bear its own costs in this appeal.