Wendy **MANNO**, Plaintiff,

v.

**BJ'S WHOLESALE CLUB Inc., and Nicholas Jenkins, Defendants.**

No. 00–CV–10088–PBS.

United States District Court, D. Massachusetts.

July 17, 2001.

Jessica Sales, Cohen & Sales, Sommerville, MA, Eric Stafford, Somerville, MA, for Plaintiff.

Joan I. Ackerstein, Donna F. Aharonson, Jackson, Lewis, Schnitzler & Krupman, Boston, MA, Joseph R. Leone, Law Offices of Joseph Leone, Farmingham, MA, for Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *INTRODUCTION*

Plaintiff Wendy Manno brings this suit against her former employer, BJ's Wholesale Club, and a former co-worker, Nicholas Jenkins, alleging state and federal claims of sexual harassment and gender discrimination for incidents that occurred during her employment at BJ's.[1] Defendant BJ's moves for partial summary judgment, asserting that the state law claims for sexual harassment (Counts II) and gender discrimination (Count IV) based on incidents that transpired prior to December 24, 1998 are time-barred under the six-month statute of limitations for claims brought pursuant to Mass.Gen.Laws. ch. 151B, § 5. After a hearing, BJ's motion is *DENIED* as to Counts II and IV.

### II. *BACKGROUND*

Drawing all inferences in favor of the non-moving party (the plaintiff), the Court treats the following facts as undisputed although they are hotly contested.[2]

Wendy Manno was employed in the marketing department at BJ's headquarters in Natick, Massachusetts from March 1998 until June 1999. During most of this time, Defendant Nicholas Jenkins was also employed in the marketing department. Manno alleges that for a ten-month period, between August 1998 and June 1999, she was subjected to repeated and continuous harassment by Jenkins. Manno's suit is based on the following incidents.

In August 1998, Manno entered Jenkins' cubicle to retrieve a computer file entitled "Fuel Your Fund-raiser." While Manno was looking at the computer, she felt Jenkins pinch her buttocks. Even though Manno was aware that this conduct was inappropriate, she pretended the incident did not happen and did not say anything about it to Jenkins or anyone else. (Akerstein Aff.Ex. A (Manno Statement) ¶ 1, Ex. B (Manno Depo.Tr.Vol. II) at 2–55.)

In September 1998, Manno was sitting at her computer when Jenkins walked behind her, placed his hands on her shoulders, and then slid them down onto her breasts. Manno immediately told Jenkins to "cut it out" and to "get away from [her]." (*Id.* Ex. A ¶ 2.) Manno understood that this act constituted sexual harassment. (*Id.* Ex. B at 2–56.)

Between September 1998 and December 1998, Jenkins continuously questioned and made comments to Manno about a man she was dating named Dave. Jenkins often asked Manno if she had slept with Dave, and Manno told Jenkins that it was none of his business. Manno states that "many people" in the office overheard Jenkins harassing her about dating in general. Manno reported this harassment to her manager, Alicia Schwehr, who became

---

**1.** In her complaint, Manno alleges sexual harassment (Counts I and II) and gender discrimination (Counts IV and V) in violation of Title VII of the Civil Rights Act of 1964 and Mass.Gen.Laws. ch. 151B against BJ's and Jenkins, as well as state law claims against Jenkins for assault and battery (Count VI), intentional infliction of emotional distress (Count VII), and false imprisonment (Count VIII). Manno also alleges that Jenkins' sexual harassment violated Mass.Gen.Laws ch. 214, § 1C (Count III).

**2.** For example Jenkins denies any sexual harassment and Manno's supervisor denies getting any notice of harassment.

Manno's manager in December 1998. Schwehr told Manno that [Jenkins] was "just jealous."[3] (*Id.* Ex. A ¶ 4.).

In the first week of December 1998, Jenkins walked into Manno's cubicle and grabbed her crotch very hard. Manno told Jenkins to "stop it," but Jenkins refused to let go for about five seconds. Manno then shoved Jenkins away from her as another co-worker, Natasha Rusch–Duffin ("Duffin"), entered the cubicle. Manno told Duffin what had occurred and they both went outside to calm down. Later that same day, Jenkins again entered Manno's cubicle and grabbed her.[4] Manno immediately pushed Jenkins away and told him to get his hands off of her. She then ran to Duffin and another co-worker to discuss what had happened. (*Id.* Ex. A ¶ 5, Ex. B at 2–55.)

In roughly December 1998, Jenkins was showing Manno where to find something in a storage room. While Manno was looking through boxes, Jenkins asked her to "look at this," and when she turned to look, Jenkins had his pants down and penis exposed. Jenkins grabbed Manno's hand and tried to make her touch his penis. Manno yelled at Jenkins to let go of her hand and to stop. Manno ran back to her cubicle, shocked at what had happened. Manno reported this incident to Schwehr in March 1999, at which time Schwehr responded that Jenkins was going to get into serious trouble if he did not stop his behavior. Schwehr took no action in response to Manno's report. (*Id.* Ex. A ¶ 8.)

In December 1998, after Schwehr became Manno's manager, Manno was moved to an office next to Schwehr's office. Schwehr told Manno that she would not have to worry so much about Jenkins ha-rassing her now that Manno was away from Jenkins in an office. (*Id.* Ex. A ¶ 6.)

Manno alleges that since December 1998, Jenkins made sexually offensive telephone calls to her at work and at home. She asserts that she reported these telephone calls to Schwehr. (*Id.* Ex. A ¶ 9.) Manno also states that she received sexually offensive messages from Jenkins on her phone-mail. She transferred these messages to Schwehr on several occasions, but Schwehr took no action in response to the calls. (*Id.* Ex. A ¶ 10.)

Manno states that in early 1999, Jenkins told her about a woman he was dating from the finance department at BJ's. Jenkins detailed for Manno a sexual encounter he had with the woman. Manno told Jenkins she did not want to know the details and that she was disgusted. At one point, Jenkins urged Manno to have a "threesome" with the woman and stated that Manno might enjoy being with another woman. Manno informed Schwehr about these incidents, but Schwehr did nothing in response. (*Id.* Ex. A ¶ 15.)

In February 1999, Jenkins wrote a letter to Manno which stated that he wanted to "fuck" her. Manno showed this note to a co-worker, Alaina Gurwitch. Manno wrote on the note "keep dreaming" and gave it to Gurwitch to give to Jenkins. Jenkins angrily confronted Manno in her office about showing the letter to Gurwitch. Manno informed Jenkins that he was a "pig" and could get fired for writing the letter. (*Id.* Ex. A ¶ 14.)

Around March 20, 1999, Manno and Schwehr were having a meeting in Schwehr's office, when Jenkins interrupted and handed Manno a folded piece of paper and walked out of the office. Upon unfolding the paper, Manno found a condom

---

3. The record does not indicate when Manno notified Schwehr of Jenkins' harassment.

4. The record does not indicate in what manner Jenkins grabbed Manno.

inside. Manno placed the condom on Schwehr's desk and stated "this is crazy." Jenkins reentered the office smiling and stated that Manno may need to use the condom while running around town on the weekends. Schwehr laughed and pulled a condom out of her purse, showing Manno how she keeps a condom with her at all times. Manno was disgusted by Schwehr's reaction. (*Id.* Ex. A ¶ 20.)

Sometime in March 1999, Jenkins rubbed his body against Manno in front of Schwehr and Gurwitch. Schwehr told Jenkins to "stop it now, break it up [Jenkins], you're a little to close for comfort." Schwehr took no further action in response to this incident. (*Id.* Ex. A ¶ 21.)

On another occasion in March 1999, Jenkins grabbed Manno's buttocks in front of Gurwitch while they were in Gurwitch's cubicle. (*Id.* Ex. A ¶ 19.)

In April 1999, Jenkins said to Manno that he wanted to "fuck" Cathy Keune, a co-worker. Jenkins said this to Manno in the presence of Schwehr on several occasions. Schwehr would laugh at Jenkins and tell him he had no chance with Keune. (*Id.* Ex. A ¶ 25.)

In May 1999, Manno and Schwehr were sitting in Schwehr's office when Jenkins entered, grabbed his crotch, and began unzipping his pants. Schwehr laughed, covered her eyes, and told Jenkins to "get out of here, I don't want to see that." Manno told Schwehr that Jenkins' conduct was getting worse and that someone needed to talk to Jenkins about his behavior. (*Id.* Ex. A ¶ 27 at 6.)

On May 28, 1999, Manno was sitting at her computer when Jenkins walked into her office and proceeded to look at a telephone list hanging on a cork board located behind Manno. After seeing what Jenkins was doing, Manno turned to her computer and continued to type. Jenkins then pro-

ceeded to stick his hands down Manno's shirt and attempted to grab and squeeze her breasts. Manno shouted at Jenkins to get out of the office. Jenkins closed the door to the office and once again tried to grab Manno's breasts. Manno grabbed Jenkins arm and shouted at him to stop. Jenkins replied, "Come on Wendy, just let me feel them. One quick feel." Manno began to shout louder and Jenkins walked out of the office. Manno reported this incident to Schwehr that same day. Schwehr told Manno to write down everything that Jenkins did to her so that it would not "come back on [Manno]" one day. (*Id.* Ex. A ¶ 30 at 6.)

Later that same day, Jenkins again went into Manno's office and attempted to grab her breast stating, "I want a feel, just a feel. Come on. Let me just touch them." Manno shoved Jenkins away and yelled at him to stop touching her. Manno left her office and went outside to have a cigarette because Jenkins would not leave. Manno reported this incident to Schwehr who told her to write down what happened. Schwehr said that she would report the incident to Bev Smith, the AVP, when Smith returned to work the following Tuesday. (*Id.* Ex. A ¶ 27 at 7.)

On Tuesday, June 1, 1999, Schwehr told Manno that Smith was out of the office and stated that she was not sure what to do about Jenkins' conduct. Schwehr told Manno that if Jenkins came after or touched her, Manno should go to Schwehr's office and tell her. Later that day, while Schwehr was at lunch, Jenkins went into Manno's office and looked down Manno's dress at her breasts. Manno told Jenkins to leave the office. Jenkins laughed, swiped at Manno's breasts, and said, "Come on, Wendy. Just one feel. One quick feel." Manno once again shouted at Jenkins to stop and to leave the office. Jenkins continued to stare at Man-

no's breasts and attempted to grab them. Manno ran out of her office to Alaina Gurwitch's cubicle. Jenkins followed Manno and attempted to grab her in front of Gurwitch who told them both to leave because she was on a business call. Manno returned to her office crying. Gurwitch then went to Manno's office, and Manno told her what had happened. Manno told Gurwitch to tell Schwehr, who was at lunch, that she (Manno) could no longer work in the office and was leaving. As Manno was leaving the parking lot to go home, Schwehr was returning from lunch. Upon seeing Manno, Schwehr approached her. Manno told her, "I am no longer working like this. I have had it." Schwehr told Manno to go home and that she would be paid for the rest of the day. Schwehr stated that she would talk with Smith the next morning. (*Id.* Ex. A ¶ 28 at 7.)

On June 2, 1999, Manno met with Marie Reenstierna, the Home Office Relations Manager, and an attorney from BJ's and told them about Jenkins' sexual harassment. Manno left after this meeting and did not return to work for BJ's. On June 3, 1999, Manno was notified that Jenkins was released from his employment at BJ's.

In addition to the numerous incidents of sexual harassment which Manno reported in her eleven-page statement to the Massachusetts Commission Against Discrimination ("MCAD"), the record reveals that Jenkins spit water on Manno as she talked with BJ's customers on the phone (*Id.* Ex. A ¶ 3); flung elastics at Manno's face (*Id.* Ex. A ¶ 11); wrote on Manno's shirt and on pictures of her children (*Id.*); hit Manno in the head with two "pool noodles" (*Id.* Ex. A ¶ 13); and verbally and emotionally harassed Manno (*Id.* Ex. A ¶¶ 11, 12, & 17.)

At all times during Manno's employment, BJ's had a sexual harassment policy set forth in its Home Office Policy Manual. (Pl's. Mem. in Supp. of Opp'n to Mot. for Partial Summ.J.Ex. 4.) The policy directs employees to immediately report incidents of sexual harassment to the Home Office Team Member Relations Manager, Marie Reenstierna; the AVP; the Team Member Relations Manager, Ken Rowell; Human Resources; or the Team Member's Manager or Division Director. (*Id.* at 2.) The policy further provides that "[i]f the incident of sexual harassment is reported directly to the Manager or Division Director, or either one of them becomes aware of possible sexual harassment, s/he must immediately report the complaint to the Home Office Team Member Relations Manager, who will commence an investigation immediately and decide the appropriate remedial action." (*Id.*)

Manno filed her Charge of Discrimination against BJ's and Jenkins with the MCAD on June 24, 1999, alleging hostile work environment sexual harassment. After investigating Manno's claims, on December 30, 1999, the MCAD granted her request to bring the case to this Court.

## III.  *DISCUSSION*

### A.  *Standard of Review*

A motion for summary judgment shall be allowed "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "To succeed [on a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 37 (1st Cir.1995); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R.Civ.P. 56(e). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers,* 902 F.2d at 143 (quoting *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505). "Issues of timely filing may be decided under Rule 56 if the relevant facts are sufficiently clear." *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33,* 921 F.2d 396, 399 (1st Cir.1990) (quoting *Jensen v. Frank,* 912 F.2d 517, 520 (1st Cir.1990)). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour,* 63 F.3d at 36 (citing *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir.1994)).

**B.** *Sexual Harassment*

Mass.Gen.Laws ch. 151B, § 4(1) states in relevant part:

It shall be an unlawful practice: (1) for an employer, by himself or his agent, because of the ... sex ... of any individual to ... discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

*Id.* In addition, § 4(16) prohibits "an employer, personally or through its agents, to sexually harass any employee." *Id.* Sexual harassment is defined as:

sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment. Discrimination on the basis of sex shall include, but not be limited to, sexual harassment.

*Id.* § 1(18). Because Manno claims BJ's inadequately responded to the sexually offensive work environment created by Jenkins, the Court will deal with sexual harassment as defined under § 1(18)(b).

To be actionable as hostile work environment sexual harassment under Mass.Gen.Laws ch. 151B, conduct must be sufficiently severe and pervasive, considering the totality of the circumstances, to alter the terms and conditions of the plaintiff's employment. *College–Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination,* 400 Mass. 156, 162, 508 N.E.2d 587, 591 (1987) (holding that a hostile work environment is one that is "pervaded by harassment or abuse, with the resulting intimidation, humiliation and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace.").

"An employer is liable for sexual harassment in the workplace if the employer is notified of the condition and fails

to take adequate steps to remedy the situation." *Id.* at 166–67, 508 N.E.2d 587. Thus, an employer who is notified of the sexual harassment has an affirmative obligation to remedy the situation. *Id.* at 167, 508 N.E.2d 587. An employee can demonstrate that the employer knew of the harassment by showing that she complained to management. *College–Town,* 400 Mass. at 166–67, 508 N.E.2d at 593.

The record contains ample evidence suggesting that Jenkins' conduct towards Manno constituted sexual harassment. There is also evidence (albeit disputed) that suggests BJ's was on notice of the harassment once Manno told her manager, Alicia Schwehr, of Jenkins' conduct. Once notified, BJ's had an affirmative duty to take adequate steps to remedy the hostile work environment that affected the terms of Manno's employment. Because BJ's seeks to limit the acts for which Manno may recover under Mass.Gen.Laws ch. 151B, the Court must determine at what point BJ's was on notice of Jenkins' harassment. BJ's relies on the applicable statute of limitations to limit its potential liability. A brief mention of the law dealing with BJ's argument is warranted.

### C. *Statute of Limitations*

█ An employee seeking to pursue claims under Mass.Gen.Laws. ch. 151B, § 4 is required to file a charge of discrimination with the MCAD within six months of the occurrence of the discriminatory act. *Id.* § 5. The purpose of this requirement is two fold: (1) to provide the MCAD with an opportunity to investigate and conciliate the claim of discrimination; and (2) to provide notice to the defendant of potential liability. *Cuddyer v. Stop & Shop Supermarket Co.,* 434 Mass. 521, 531, 750 N.E.2d 928, 936 (2001); *accord Carter v. Comm'r of Correction,* 43 Mass.App.Ct. 212, 217, 681 N.E.2d 1255 (1997). This limitations period does not apply, however, "where facts are alleged which indicate that the

unlawful conduct complained of is of a continuing nature." Mass.Regs.Code tit. 804, § 1.10(2). This "continuing violation" exception recognizes that some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact. *Cuddyer,* 434 Mass. 521, 531, 750 N.E.2d 928, 936. In *Cuddyer,* the Supreme Judicial Court articulated the plaintiff's burden in establishing a timely claim of hostile work environment as follows:

> She must show, within the six-month limitation period, the existence of at least one incident of sexual conduct which, standing alone might not necessarily support her claim, but which substantially relates to earlier incidents of abuse, and substantially contributes to the continuation of a hostile work environment, such that the incident anchors all related incidents, thereby making the entirety of the claim for discriminatory conduct timely.

434 Mass. 521, 533, 750 N.E.2d 928, 938.

█ Both *College–Town* and *Cuddyer* involved a claim that a supervisor sexually harassed a subordinate. Under Mass. Gen.L. ch. 151B, § 4, an employer is vicariously liable for sexual harassment committed by a supervisor regardless of whether the employer is placed on notice of the discrimination. *College–Town,* 400 Mass. at 167, 508 N.E.2d 587. Because this case involves a claim of co-worker sexual harassment, the legal analysis is somewhat different. BJ's argues that because Manno did not file her charge of discrimination with the MCAD until June 24, 1999, acts committed by Jenkins before December 24, 1998 are outside the statute of limitations period. BJ's contends that because Manno knew by at least Septem-

ber 1998 that she was being sexually harassed by Jenkins,[5] Manno was required to file her MCAD complaint within six months of that time.[6]

As stated above, BJ's liability under Mass.Gen.Laws ch. 151B attaches when BJ's was notified of the harassment and failed to take adequate remedial action. While there is no MCAD regulation directly on point, Manno had until six months from the date of the alleged unlawful conduct—that is, when BJ's was on notice of Jenkins' harassment and failed to respond in reasonable fashion—to file her complaint with the MCAD. Here, the record indicates that Manno notified BJ's of Jenkins' harassment some time in December 1998, and filed her complaint with the MCAD six months later. While the exact date of notification in December is unclear, plaintiff is entitled—and as the Supreme Judicial Court pointed out in *Cuddyer*, should be encouraged—to wait a reasonable time for the employer to respond by investigating and remedying the situation before ratcheting up the dispute by filing an MCAD complaint. Defendant has not demonstrated that plaintiff delayed initiating her suit in an unreasonable way under an objective standard. *Cuddyer* at 434 Mass. 521, 537–38, 750 N.E.2d 928, 940. BJ's footnotes their argument that plaintiff unreasonably failed to avail herself of the corrective opportunities provided by BJ's because she notified the wrong person about her harassment claim in December. *See Faragher v. City of Boca Raton,* 524

U.S. 775, 807–808, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). The key issue for statute of limitations purposes is when the employer was on notice of the claim regardless of whether the employee followed the correct procedures for voicing or filing a grievance. Whether the so-called *Faragher–Ellerth* defense is viable cannot be resolved on this record.

## IV. *ORDER*

For the foregoing reasons, BJ's Motion for Partial Summary Judgment (Docket No. 56) is ***DENIED*** as to Counts II and IV.

5. After the August 1998 incident, Manno knew Jenkins' conduct was "inappropriate," and after the September 1998 incident, Manno was aware that Jenkins' conduct constituted sexual harassment.

6. Understandably, BJ's relies on the federal approach to the "continuing violation" doctrine in construing Massachusetts law. *See Keeler v. Putnam Fiduciary Trust Co.,* 238

F.3d 5, 11–12 (1st Cir.2001) ("Absent clearer guidance from Massachusetts courts, we will follow the well-established *Provencher* and *Sabree* [federal] approach in cases like this one governed by Massachusetts law."). *Provencher v. CVS Pharmacy,* 145 F.3d 5, 14 (1st Cir. 1998). However, in *Cuddyer,* which was issued after oral argument, Massachusetts declined to follow this federal approach. 434 Mass. 521, 537–38, 750 N.E.2d 928, 940.