## Paul D'AMICO

v.

## COMPASS GROUP USA, INC. and Cary Orlandi

No. CIV.A. 99–CV–12025–RCS.

United States District Court, D. Massachusetts.

April 22, 2002.

Robert S. Wolfe, Wolfe Associates, Gloucester, MA, for Plaintiff.

Christopher A. Kenney, Sherin and Lodgen, Margaret H. Paget, Sherin & Lodgen, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

On September 30, 1999, plaintiff Paul D'Amico brought this discrimination action against his former employer, Compass Group USA, Inc. (Compass), and Compass Regional Vice President Cary Orlandi. Federal jurisdiction is based on alleged violations of the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq. The Complaint also sets out four supplemental Massachusetts state-law claims: disability discrimination under G.L. c. 151B, breach of the implied covenant of good faith and fair dealing, intentional interference with advantageous business relations, and intentional infliction of emotional distress. On January 24, 2002, the court heard oral argument on defendants' motion for summary judgment.

### FACTS

The facts supported by the record, taken in the light most favorable to D'Amico, are as follows. D'Amico is trained in the culinary arts. In August of 1984, he was

hired by Canteen Corporation (Canteen), a predecessor of Compass. Conteen was, and Compass remains in the business of providing on-site corporate cafeteria services. By April of 1987, D'Amico had earned four promotions and had received generally favorable work evaluations as "competent" and "competent plus."[1] In 1988, Orlandi became D'Amico's supervisor. In September of 1988, Orlandi evaluated D'Amico as "competent plus." Over the next four years, D'Amico received commendable ratings and a further promotion. In 1993, D'Amico relocated to Canteen's home office in South Carolina to become National Safety and Quality Control Manager. In that position, D'Amico redesigned Canteen's safety manuals and training protocols.

After Compass purchased Canteen in 1994, D'Amico moved to Compass headquarters in North Carolina where he was named Manager of Merchandising Services. D'Amico trained for the position in England. In December of 1994, Compass group CEO Michael Bailey gave D'Amico a "commendable minus" evaluation.[2] In January of 1996, a "distinguished" rating earned D'Amico a 10% raise. D'Amico was also chosen to make a presentation to the Compass Board of Directors in London.

D'Amico then transferred to the Northeastern region where he worked as a District Manager under Orlandi. D'Amico had responsibility for seventeen major corporate accounts in three states. From 1996 until 1998, Orlandi and Regional Manager Ed Baia gave D'Amico "competent" and "competent plus" evaluations.

In December of 1997, D'Amico's wife asked for a divorce. D'Amico thereafter twice complained to his physician about depression. The doctor suggested marital counseling.

On January 29, 1998, D'Amico collapsed while visiting a client. He was taken to the emergency room at Lowell General Hospital where he remained unconscious for four hours. After several tests, D'Amico was transferred to Hampstead Hospital, a psychiatric facility. The attending psychiatrist, Dr. Weiss, prescribed Paxil, an anti-depressant drug similar to Prozac.[3] D'Amico was discharged with a recommendation from Dr. Weiss that he remain at home for a week to recuperate.[4]

While resting at home, D'Amico received a call from Senior District Manager Philip Canning. D'Amico asked Canning for an additional week of medical leave, which was denied.[5] D'Amico returned to work

---

1. Canteen (and later Compass) evaluated employees on an ascending scale as "marginal," "competent," "commendable," or "distinguished."

2. D'Amico alleges that Bailey encouraged him to continue his career in corporate management by dangling the prospect of an eventual promotion to a Regional Vice Presidency (the position held by Orlandi). D'Amico argues that Bailey's encouragement was indicative of the high regard in which he was held by upper-level management, and explains Orlandi's motive (jealousy) in causing his termination. None of the record citations given by D'Amico factually support the promissory statements attributed to Bailey.

3. Dr. Weiss's notes indicate that D'Amico was given a sample of Paxil. D'Amico's deposition testimony is ambiguous as to whether he ever took the medication.

4. D'Amico's brief states that Dr. Weiss prescribed three weeks of bed rest. This is contradicted by Dr. Weiss's hospital notes, which read "Note re work x1 wk/RTW 2/9/98."

5. In his interrogatory answers, D'Amico stated that he had called Orlandi (not Canning), while he was recuperating at home to ask for three weeks of medical leave. However, in his deposition, D'Amico testified that he made the request of Canning and had spoken to Orlandi only after his return to work on February 11, 1998.

on February 11, 1998 (a Wednesday).[6] He suffered no loss in pay as a result of taking the two unauthorized extra days. Moreover, during his absence, Orlandi awarded D'Amico a "competent plus" evaluation and a raise.

D'Amico resumed his full job responsibilities, stating that "[o]ther than the collapse, there is little evidence that I was limited by the disability beyond February 11, 1998."[7] However, on February 15, 1998, Orlandi told D'Amico that he was not "focused." On March 23, 1998, Canning cited D'Amico in an "Employee Counseling Report" for failing to respond to time-sensitive requests.[8] D'Amico was removed from all but one of his accounts (Teradyne) and had his salary reduced by $11,000 per annum. The Counseling Report stated that the demotion would remain in effect until D'Amico's next scheduled bi-annual review.[9]

D'Amico testified that by April of 1998, he was "no longer suffering from or disabled by depression," noting that he had begun dating a woman whom he would eventually marry and "had a smile on [his] face." On April 16, 1998, however, Canning gave D'Amico a "marginal" performance review and a further demotion.

Three months later, D'Amico asked to be reinstated to his District Manager's position. Orlandi told him he would have to wait at least a year to prove himself. D'Amico then sought to interview for an equivalent position in another division. Orlandi, however, refused to give him a favorable recommendation. D'Amico unsuccessfully appealed Orlandi's refusal to Compass's Human Resources Department.

D'Amico next sought the aid of CEO Bailey, asking that he intervene on his behalf with Orlandi. Bailey refused and told D'Amico to resolve his differences with Orlandi or file a grievance. D'Amico states that Bailey promised that 'if the conflict with Orlandi could not be amicably resolved, D'Amico could retire with the equivalent of a District Manager's severance package. In December of 1998, D'Amico met with Orlandi to seek his support for a transfer or promotion. Orlandi would not agree, and told D'Amico that this was "what happen[s] when you [complain] to the CEO."

In January of 1999, Teradyne complained to Orlandi about the quality of the service D'Amico was providing. During a follow-up visit to Teradyne, Orlandi told D'Amico that he had no future with Compass and that he intended to make D'Amico's life miserable for having gone over his head to Bailey. He also told D'Amico that he "owned" him. On January 8, 1999, D'Amico's immediate supervisor, Matt Jacobson, drafted a remedial plan to address Teradyne's complaints, stating that if things did not improve by January 20,

---

6. D'Amico's brief states that he missed two weeks of work, but it is clear from the record that he in fact returned to work on February 11, 1998.

7. D'Amico, however, stated in his deposition that had he been given more time to recuperate, he could have better managed the responsibilities of his job.

8. D'Amico maintains that Canning unfairly criticized his computer skills and writing style.

9. D'Amico's brief suggests that the reduction in work load came at his request after his application for additional leave was rejected. D'Amico states, however, that he was not aware that he would suffer a reduction in title and pay as a result. Moreover, he believed that the probationary period would last only three months.

1999, he would have "no option except to terminate [D'Amico's] employment." [10]

D'Amico was scheduled for annual vacation on February 5, 1999. Before his departure, D'Amico was told by Orlandi and Jacobson that he would be demoted to the duties of a "relief chef" upon his return. During his vacation, D'Amico drove to North Carolina to again seek Bailey's help. Bailey refused to become involved.

Upon his return to work on February 20, 1999, D'Amico's pay was decreased by $200 per week. D'Amico worked briefly as a floating chef and "deli guy" before complaining to Orlandi, who then suspended him. D'Amico resigned, declining the offer of a severance package because it was not commensurate with that of a District Manager. This lawsuit followed.

### DISCUSSION

Defendants challenge D'Amico's FMLA claim on three grounds: (1) that D'Amico did not suffer from a "serious health condition" within the meaning of the FMLA; (2) that there is no evidence that D'Amico was ever denied a medical leave to which he was entitled; and (3) that there is no evidentiary support for D'Amico's retaliation claim.

The FMLA guarantees an eligible employee "up to twelve weeks of unpaid leave per year ... when the employee has 'a serious health condition that makes [him or her] unable to perform the functions of [his or her] position,' 29 U.S.C. § 2612(a)(1)(D)." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir.1998). "[S]erious health condition'

means an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). [11]

■ There is no dispute that D'Amico did not receive inpatient care as a result of his collapse. Thus, to demonstrate a "serious health condition," D'Amico must show that his fainting spell resulted in "continuing treatment by a health care provider." The Court in *Hodgens*, in giving content to this phrase, defined the term as embracing one or both of the following: [12]

(1) The employee or family member in question is treated two or more times for the injury or illness by a health care provider. Normally this would require visits to the health care provider or to a nurse or physician's assistant under direct supervision of the health care provider. (2) The employee or family member is treated for the injury or illness two or more times by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider, or is treated for the injury or illness by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider—for example, a course of medication or therapy—to resolve the health condition.

*Hodgens*, 144 F.3d at 161.

■ While D'Amico's treatment did not involve two or more visits to a health care

---

**10.** D'Amico contends that there were no funds available to implement the remedial plan.

**11.** In *Laro v. New Hampshire*, 259 F.3d 1, 4 (1st Cir.2001), the Court of Appeals held 29 U.S.C. § 2611(4)(A)(iii) unconstitutional in that it authorized a cause of action against a

State in contravention of the Eleventh Amendment. *Laro*, however, has no application to this case.

**12.** The Court in *Hodgens* drew this definition from then-existing Department of Labor regulations.

provider, he was prescribed an anti-depressant medication. This would seem sufficient to satisfy *Hodgen's* very light burden of showing at least one visit resulting in a course of prescribed medication. While defendants argue that there is no evidence that D'Amico even took the Paxil, and hence followed no "course" of treatment, a patient's failure to cooperate with a prescribed regimen of care cannot reasonably be perceived to invalidate the doctor's diagnosis that the patient's medical condition is worthy of treatment.[13]

Defendants second argument, that D'Amico was not eligible for extended medical leave, stands on firmer ground. It will be recalled that Dr. Weiss recommended that D'Amico remain out of work until February 9, 1998. D'Amico returned to work on February 11, 1998, after his request for additional leave was refused. While subjectively, D'Amico might have thought that additional leave was desirable, D'Amico's own testimony confirms that his health did not render him "unable to perform the functions of [his] position," as the FMLA requires. 29 U.S.C. § 2612(a)(1)(D).

It is, of course, possible to be cured of a serious medical condition and yet be perceived to still suffer from it, and to be discriminated against as a result. D'Amico does not press precisely this point, but does argue that his termination was in retaliation for his requesting and taking FMLA leave. The FMLA "prohibit[s] an employer 'from discriminating against employees ... who have used FMLA leave' or from using such leave 'as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.' 29 C.F.R. § 825.220(c) (2000)." *Keeler v.*

*Putnam Fiduciary Trust Co.*, 238 F.3d 5, 8 (1st Cir.2001).

> [W]hen there is no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies to claims that an employee was discriminated against for availing himself of FMLA-protected rights. *McDonnell Douglas* allocates the burdens of production and persuasion in accordance with a three-step procedure. Under that framework, a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of discrimination or retaliation. If he does so, then the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]," sufficient to raise a genuine issue of fact as to whether it discriminated against the employee. The employer "must clearly set forth, through the introduction of admissible evidence, the reasons for the [employee's termination]. The explanation provided must be legally sufficient to justify a judgment for the [employer]." If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave.

*Hodgens*, 144 F.3d at 160–161 (internal citations omitted).

■ Defendants, who do not contest D'Amico's prima facie case, have produced evidence that from April of 1998, to February of 1999, three different supervisors and D'Amico's sole customer account (Ter-

---

**13.** It should be noted that a "serious medical condition" under the FMLA need not exhibit the durational component required to show a disability under the Americans with Disabilities Act. *Navarro v. Pfizer Corp.*, 261 F.3d 90, 102 (1st Cir.2001).

adyne) complained about his performance.[14] This is more than adequate to meet an employer's minimal obligations under *McDonnell Douglas* to come forward with a nondiscriminatory explanation of an adverse employment action, and to shift the burden of producing evidence of animus (or pretext) to the plaintiff. In this regard, D'Amico cites his "rapid" descent from District Manager to "deli guy," and Orlandi's resentment of his having bypassed the chain-of-command in going directly to Bailey, as demonstrating a discriminatory animus on Orlandi's (and Compass's) part.

■ While it is true that summary judgment is not favored in motive-based cases, it may be granted where a plaintiff has failed to produce evidence that would permit a fact finder to disbelieve an employer's nondiscriminatory explanation and to infer instead a discriminatory or retaliatory purpose. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Keeler*, 238 F.3d at 9. The explanation for D'Amico's termination may be his failure to meet corporate expectations (as defendants maintain), or it may reflect a vindictive settling of personal accounts by Orlandi (as D'Amico contends). If the latter is true (and for purposes of summary judgment it will be deemed so), it reflects badly on Orlandi. It does not, however, establish a discriminatory motive (in a protected sense) on Orlandi's part. Churlish and insensitive behavior by a supervisor, however regrettable, and however harmful to an employee, is not conduct falling within the prohibitions of the anti-discrimination laws. Nor does D'Amico's "rapid" descent, in of itself, support an inference of retaliation related to his FMLA leave. While D'Amico might understandably perceive his fall as precipitous, given his long, and until 1998, generally successful career at Compass, the year separating his taking of FMLA leave and his resignation, without more, is simply too extended a time to establish a causal connection between the two events. *See Lewis v. Gillette Co.*, 22 F.3d 22, 25 (1st Cir.1994); *see also Wyatt v. City of Boston*, 35 F.3d 13, 15 (1st Cir.1994). Consequently, the FMLA claims will be dismissed.[15]

### ORDER

For the foregoing reasons, the defendants' motion for summary judgment is *ALLOWED* as to D'Amico's FMLA claims. The supplemental state-law claims will be *DISMISSED* without prejudice. Plaintiff's attention is directed to 28 U.S.C. § 1367(d).

SO ORDERED.

---

14. Defendants state that four different supervisors complained about D'Amico's performance: Baia, Orlandi, Canning and Jacobson. The record, however, does not reflect a negative review in that time frame from Baia.

15. While the court would ordinarily proceed to decide the pendent state-law claims (as the case was originally filed in federal court), I will not do so in this instance. D'Amico's principal state-law claim is one of disability discrimination. While it seems reasonably certain that D'Amico would not be considered disabled under federal law, the Supreme Judicial Court has indicated that it will no longer defer to federal case law in defining a "disability" for purposes of G.L. c. 151B. *See Dahill v. Police Department of Boston*, 434 Mass. 233, 748 N.E.2d 956 (2001). Whether D'Amico would be considered disabled under state law *is a question better answered by the State courts.*